In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1028

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

RICKY SWIFT and JOE LOUIS TAYLOR,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:99 CR 44--Robert L. Miller, Jr., Judge.

Argued June 5, 2000--Decided July 17, 2000

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  Around 8:30 a.m. on
September 2, 1999, two men robbed the First
Source Bank in Osceola, Indiana, a few miles east
of Mishawaka and its neighbor, South Bend. Within
hours of the robbery, the police thought they had
the bandits in their clutches. But their case hit
the skids when the suspects (now the defendants),
Ricky Swift and Joe Taylor, filed motions to
suppress the evidence, which the district court
granted. The court reasoned that the duo was
arrested without probable cause. This
determination led to the conclusion that all the
evidence seized after the arrest had to be
excluded as "fruit of the poisonous tree." The
government appeals this decision.
  The facts, which we will set out in some
detail, are pretty much undisputed. Our standard
of review is de novo. Ornelas v. United States,
517 U.S. 690 (1996); United States v. Finke, 85
F.3d 1275 (7th Cir. 1996). Here, then, are the
facts.

  Officer Richard Hurley of the Mishawaka police
department heard the first of several calls about
the robbery at 8:31 a.m. It was reported that two
African-American men, armed and wearing dark,
hooded clothing, beards (probably fake), and
braids, robbed the bank and fled in a red Jeep
Grand Cherokee bearing an Indiana license plate

beginning with "71A." Officer Hurley and other officers set up a perimeter around the area to watch for a red Jeep. When that effort was unsuccessful, Robert Sherbun, a captain in Mishawaka's detective bureau, ordered Hurley to go to Hickory Village, an apartment complex about 9 miles from the bank, where he knew a red Jeep had been seen, one which he thought was associated with other robberies. Lieutenant George Haywood and Officer Steve Madison were also looking for the red Jeep Cherokee at Hickory Village. Once in the Hickory Village vicinity, a red, 4-door, 1991 Jeep Cherokee Sport bearing Indiana license number 71E1905, driven by an African-American male with another African-American man in the passenger seat, passed in front of Hurley. He radioed his observations to other officers at 9:53 a.m. (time is very important and this one, an hour and 23 minutes after the robbery, should be noted) and stopped the Jeep. Officers Haywood and Madison pulled in behind Hurley.

Officer Hurley asked for identification from the men in the Jeep; both produced drivers licenses. The driver's identification said he was Ricky Swift, and the passenger's license identified him as Joseph Taylor. Hurley radioed in the names. At the same time, he recalled that Swift was a suspect in some Mishawaka and South Bend robberies in the 1980's.

Hurley then asked Swift who owned the Jeep; Swift said it was his mother's. When Hurley asked Swift where he was coming from, Swift said he had been at Joe Taylor's house in Hickory Village. When Hurley observed that Taylor's drivers license did not give a Hickory Village address, Swift responded, "Well, we didn't do nothing, man."

Hurley asked Swift if the officers could search the Jeep, and Swift agreed. The officers asked the men to get out of the Jeep, and a pat-down for weapons came up dry. Hurley and Lieutenant Haywood then did a search in the Jeep, but they saw nothing they personally recognized as evidence of participation in the bank robbery, although, as it turns out, two items that looked innocent--but were very incriminating--were there.

Meanwhile, Captain Sherbun was at the bank. He learned the identities of the Jeep's occupants over the radio. And the names, Swift and Taylor, he said "kind of rang a bell" for he recalled that both were involved (he offered no other details on this and there were no convictions) in a series of restaurant robberies in which employees were tied up or put in a cooler.

Importantly, from his investigation at the bank, he learned that the robbers had bound the employees with duct tape and placed them in a separate room during the robbery. He saw a similar pattern between the restaurant robberies (apparently some occurred a dozen years ago and one a little over a year ago) and the Osceola bank robbery. For that reason, at 10:02 a.m. (note the time again) Sherbun directed the officers at the Jeep to take Swift and Taylor to the Mishawaka police station. He informed the officers that he was on his way to where the Jeep had been stopped.

Swift and Taylor were transported to the police station in separate squad cars around 10:10 a.m. Taylor was taken to an interview room and Swift to a holding cell. Both men were required to leave their personal belongings--including Swift's pager--with the police.

Captain Sherbun arrived at the Jeep by 10:25 and looked inside by extending his head into the open front window. Two items caught his eye. Near the corner of the rear seat on the passenger side he saw wadded duct tape of the same color as the tape used to bind and confine the bank employees during the robbery. He also saw a headphone for a Walkman-type device; the headphone was without one of the foam cups that cover the earpieces. In the vault area of the First Source Bank that morning, Captain Sherbun had seen a round, nickel-sized, cup-shaped piece of black or grey sponge pad for a Walkman-like headphone. The ear-pad piece in the bank vault was a match for the Walkman earpiece in the jeep. These innocent-looking items, of course, had to be in view in the jeep when Hurley and Haywood looked in, but they had no reason to appreciate the significance of the items.

As to the critical facts on the issue before us, we could stop here, but we will add more details so the reader has a full picture of what was going on.
When FBI Special Agent Ronald Ryniak arrived at the scene of the Jeep stop around 11:00, he, too, saw duct tape on the rear seat, and he also recognized that it matched the tape he saw earlier at the bank. SA Ryniak began preparing an application for a search warrant for the Jeep. The warrant was issued later that evening.

At 10:47 a.m. the witness who saw the robbers drive away from the bank was brought to the Jeep. She told Sherbun that Swift's Jeep "was the same type vehicle" she saw leave the bank after the robbery.

Meanwhile, at the station, Lieutenant Robert

Pawlowski called the county prosecutor's office and spoke with a deputy prosecutor, Laura Curliss, who suggested that Swift and Taylor be put in a lineup. Lieutenant Pawlowski then began the process of getting a lineup together.

South Bend police department investigator Eugene Eyester arrived at the Mishawaka police station after hearing that Swift and Taylor had been taken there. Eyester had been assigned the investigation of an armed robbery 3 days earlier at a restaurant/tavern in South Bend called The Landing, in which two African-American males wearing fake beards and wigs duct-taped the employees. Eyester was familiar with the names of Ricky Swift and Joe Taylor, Jr. and recalled that Swift was a suspect in previous armed robberies, including one of a Long John Silver's restaurant and one of a Ponderosa.

At the station, Swift was told that the police were investigating the First Source bank robbery and The Landing robbery. Swift said he didn't want to answer any questions and asked to talk to an attorney. He called his attorney sometime around 12:10 p.m., after which he agreed to participate in a lineup. Swift declined to sign a consent to search the Jeep. Taylor declined to answer any questions about the bank robbery.

Sometime around 2:00 p.m., the officers were ready to conduct lineups. The lineups took from 2:15 to 4:30. Eight First Source Bank employees and/or witnesses and two Landing employees viewed two lineups--one with Swift and the other with Taylor. None of the First Source Bank witnesses made identifications, but the two Landing witnesses identified Taylor, and one of the Landing witnesses said he was 75 percent sure that Swift was the other robber.

At one point in the afternoon, Swift's pager (located in a small pile of his personal effects which had been taken from him upon his arrival at the jail) started sounding. Officer Eyester silenced the signal and looked at the numbers recorded on the pager as incoming calls.

Swift's pager sounded again around 5:30. Officer Eyester wrote down the number, which belonged to a Gayle Richmond who lived in the Hickory Village apartments. Officers then went to Richmond's unit at Hickory Village. Richmond signed a consent form allowing a search of her apartment. And the police struck pay dirt, finding hundreds of thousands of dollars--some of the bills were still in First Source Bank wrappers--wigs, fake beards, and a handgun. The formal bank robbery charges against Swift and Taylor followed.

The Fourth Amendment protects "against unreasonable searches and seizures." See U.S. Const. Amend. IV. The amendment does not prevent all encounters between the police and citizens. It comes into play when a police officer uses physical force or a show of authority to restrain the liberty of a citizen. United States v. Odum, 72 F.3d 1279 (7th Cir. 1995). To make an arrest, a police officer needs probable cause to believe that a person has committed or is committing a crime. See, e.g., United States v. Johnson, 910 F.2d 1506 (7th Cir. 1990). Police are also allowed to make "Terry stops," which are investigatory stops limited in scope and executed through the least restrictive means reasonable. Terry v. Ohio, 392 U.S. 1 (1968). For an investigatory stop, police officers do not need probable cause. They need only have reasonable suspicion supported by articulable facts that criminal activity is afoot. Terry. Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981). It is something less than probable cause and more than a hunch. United States v. Tipton, 3 F.3d 1119 (7th Cir. 1993). In evaluating the reasonableness of an investigatory stop, we look first to see whether the officers' actions were justified at the inception of the stop and next to see whether the stop was reasonably related in scope to the circumstances which justified the stop in the first place. United States v. Smith, 3 F.3d 1088 (7th Cir. 1993). Whether the stop is reasonable may depend in part on the nature or the length of the intrusion. United States v. Sharpe, 470 U.S. 675 (1984); United States v. Tilmon, 19 F.3d 1221 (7th Cir. 1994); United States v. Griffin, 150 F.3d 778 (7th Cir. 1998). But we must not be overly focused on any one factor. The proper analysis involves a consideration of "the totality of circumstances known to the officers at the time of the stop." United States v. Quinn, 83 F.3d 917 (7th Cir. 1996). The totality of the circumstances includes "the experience of the law enforcement agent and the behavior and characteristics of the suspect." Odum, 72 F.3d at 1284.

A difficult question often arises regarding at exactly what point a Terry stop matures into an arrest. When does the conduct of the officers exceed what is allowable under Terry and veer into the kind of major intrusion requiring probable cause? See United States v. Ienco, 182 F.3d 517, 525 (7th Cir. 1999). Then, if there was neither a reasonable suspicion or probable cause, the issue becomes whether evidence obtained by the stop is admissible or whether it must be excluded under the exclusionary rule.

The exclusionary rule is a judicially created remedy, aimed at curbing overly zealous police action. It tells police that if they obtain evidence illegally, they will not ordinarily be allowed to use it against the suspect they are after. United States v. Leon, 468 U.S. 897 (1984). Evidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471 (1963). The evidence may be purged of the taint by a finding that it was discovered by an independent source, that it would inevitably have been discovered without the unlawful search, or that its discovery is sufficiently distant in causal connection from the illegal search so as to attenuate the connection between the two. United States ex rel. Owens v. Twomey, 508 F.2d 858 (7th Cir. 1974). The goal of the "poisonous tree" doctrine is to ensure that the prosecution is not put in a better position by means of the illegality, but the countervailing consideration is that the prosecution must not be put in a worse position. Nix v. Williams, 467 U.S. 431 (1984). There is no bright-line rule to make the analysis of these issues easy.

In the district court, Swift and Taylor contended that there was no reasonable suspicion to support the Terry stop, that they were under arrest, without probable cause, when they were taken to the police station, and that all the evidence obtained after the arrest must be suppressed: the duct tape, the headphones with the missing earpiece, the telephone number obtained from Swift's pager which led the police to Richmond's apartment, and the money, wigs, fake beards, and weapons that were found there. The district court agreed with enough of the argument to order the suppression of the evidence.

Our analysis requires us to repeat some of the facts we find significant. The first is the discovery of the red Jeep Cherokee, which led the police quickly to Swift and Taylor. Witnesses said that the bank was robbed by two black men with beards and braids who escaped in a red Jeep. Officer Hurley said he thought the report indicated fake beards and braids. One witness said the vehicle was a Jeep Grand Cherokee with a license number beginning with "71A." "71" tells Indiana police that the car is registered in St. Joseph County, that is, that it is local. An immediate investigation ensued with a number of officers involved both in the search for the

robbers and in a study of the scene of the crime. Captain Sherbun was investigating the scene of the robbery while at the same time directing other officers to perform other tasks. He knew that at the Hickory Village apartment complex, located about 9 miles from the bank, there was a red Jeep Cherokee which, he thought, was associated with other robberies. Because he was at the bank and unable to personally be everywhere at once, he ordered Hurley to go to Hickory Village to look for the red Jeep. At 9:53 a.m., about 1 hour and 23 minutes after the robbery, Hurley spotted a red, 4-door Jeep Cherokee Sport, Indiana license 71E1905, with two black men inside. Suspecting that this could be the red Jeep Sherbun referred to and the same Jeep used in the bank robbery, he stopped the vehicle. This, we have no trouble concluding, was a valid Terry stop.

Also important is that during the stop, Swift gave Hurley what seemed to him to be a fishy story about having left a residence in Hickory Village, for which he did not know the address. When he was asked whose residence it was, he said it belonged to Joe Taylor. But Hurley was holding Joe Taylor's drivers license and knew Taylor was in the car with Swift. The license gave a South Bend address for Taylor, not a Hickory Village address. When confronted with this information, Swift's only response was they hadn't done anything wrong.

It is also significant that several officers had previous knowledge of Swift and Taylor. Hurley recalled that Swift was a suspect in earlier robberies in the area; he radioed in the names given on the drivers licenses. Lt. Haywood, also participating in the stop, recalled that Swift was a robbery suspect. Similarly, hearing the radio report, Captain Sherbun recalled that Swift and Taylor were suspects in a series of restaurant robberies in which employees were tied up or put in a cooler; from his investigation at the bank he learned that the robbers had placed the bank employees in a separate room during the robbery and had bound them with duct tape. And he saw the duct tape that was used. Given all this information, Sherbun wanted to look at the Jeep himself and to have a witness brought to the scene to view it.

At this point, time becomes important. At 10:02 a.m., Captain Sherbun directed the officers to take Swift and Taylor to the Mishawaka police station. The men were removed from the scene around 10:10 and arrived at the station around 10:16. Meanwhile, Sherbun was heading to the Jeep, which he told the officers to secure. He arrived at 10:25. At the station, Swift and

Taylor were told to turn over their personal belongings, including Swift's pager, and they were placed in separate rooms. Despite the government's weak argument to the contrary, we, like the district court, find that Swift and Taylor were "arrested" when they were taken from the scene around 10:10. And, arguably it is without probable cause.

We say "arguably" because although no one officer knew early on all the information in what was an ongoing investigation involving many officers (both federal and state), the critical actors had sufficient facts in their possession to support a finding of probable cause when Swift and Taylor were taken from the scene. The police had a red Jeep Cherokee (the difference between a "Grand" Cherokee and a Cherokee "Sport" is not particularly important, especially here where the "Sport" was a large, 4-door vehicle) with part of a license number close to the number actually on the vehicle. Hurley and the officers at the scene searched the Jeep, which contained, for them, innocuous duct tape and a defective earpiece to a Walkman. More importantly, their commanding officer, Captain Sherbun, who was in communication with them, had first ordered them to focus their search on Hickory Village, had accurately predicted that the red Jeep would be found there, and he recalled Taylor's and Swift's possible involvement in the restaurant robberies. Sherbun also recalled that the restaurant robbers bound up their victims in a manner similar to that used by the bank robbers. This knowledge was enough to permit Sherbun to order the continued detention of Swift and Taylor while he was en route to the scene--it may have even been enough to establish probable cause. The fact that the officers at the scene did not know all that Sherbun knew is not decisive because when a superior officer, in communication with an inferior officer, orders that officer to make an arrest, it is proper to consider the superior's knowledge in determining the overall reasonableness of the police conduct as it relates to probable cause. See United States v. Edwards, 885 F.2d 377 (7th Cir. 1989); United States v. Woods, 544 F.2d 242 (6th Cir. 1976).

But assuming there was no probable cause to arrest until the moment Sherbun personally looked in the Jeep and put it all together, it doesn't necessarily follow that the evidence should have been suppressed. For we would have to determine whether the early arrest put the police in a better position than they would have been in without it. Or whether the decision to take the men to the station, rather than keeping them at the scene until Sherbun got there and saw for himself the evidence which established probable

cause, justifies putting the prosecution in a worse position than it would have been in if the officers had held the suspects at the scene.

It is clear that the only two alternatives, as far as the police were concerned, were taking Swift and Taylor in or holding them at the scene. The suspects were not going to be released. At the time the men were transported to the police station, the information which could legitimately be sought at a Terry stop was not complete. It was not until after the men were taken from the scene that the police tried to obtain a social security number for Swift so they could do a record check. They obtained the social security number at 10:14. At 10:15 they learned the registration address for the Jeep. They still did not have the criminal record report. Knowing what they already knew and suspected, the police were not about to let Swift and Taylor go on their way, and moments after Sherbun arrived the men would have been arrested (and then taken to the police station) with solid probable cause.

Of course, if the men had been held at the scene, a different issue would be argued. The defense would say that detaining the men for 32 minutes (recall, the Jeep was stopped at 9:53 and Sherbun arrived on the scene at 10:25) means they were, in fact, under arrest. But that isn't necessarily true, for the issue would have to be analyzed under the totality of the circumstances, and the answer is by no means on the side of suppression. We have recognized that police officers face a "fluid situation" during a Terry stop. They can "graduate their responses to the demands of the particular circumstances . . . ." United States v. Weaver, 8 F.3d 1240, 1243 (7th Cir. 1993). They may, for instance, approach a vehicle with their guns drawn if they reasonably fear for their personal safety. Tilmon. An officer may have his gun drawn and order a suspect to lie prone on the ground, handcuff, and frisk him if the officer reasonably believes the suspect is dangerous. Tilmon; Smith, 3 F.3d 1088 (7th Cir. 1993).

More importantly, we have recently upheld the detention of a suspect at the scene of a Terry stop while awaiting the arrival of another officer in circumstances similar to those we face here. In United States v. Scheets, 188 F.3d 829 (7th Cir. 1999), cert. denied, 120 S. Ct. 837 (2000), police came across a suspect in a bank robbery at a casino. Their first encounter with him was consensual. He accompanied them to the security office of the casino. At some point the encounter evolved into a Terry stop for which we found there was reasonable suspicion. But then the officers held the suspect, clearly without

letting him leave, for about 15 minutes longer while another agent traveled to the scene. We said that maintaining the status quo while obtaining more information (in the person of the other investigating agent) might be the most reasonable action to take. We found that the continuance of the Terry stop was justified. Here, we think it would have been reasonable under Terry for the officers at the Jeep to hold Swift and Taylor until Captain Sherbun, who had more information and was not far away, arrived at the scene.

But they weren't held at the scene. They were taken to the station. Nine minutes after they got there, 15 minutes after they were taken from the scene, probable cause unquestionably existed for their arrest when Sherbun saw the incriminating duct tape and earphones in the Jeep and put two and two together. Meanwhile, the Jeep properly remained at the scene because police may hold a vehicle for a reasonable period of time in order to examine it further. Griffin; see also United States v. Place, 462 U.S. 696 (1983). The Jeep, as we have said, yielded the evidence which provided probable cause.

One might suggest that a question remains as to the pager, and the telephone number it much later revealed, which in turn led to the Richmond apartment with its trove of evidence. Swift and Taylor argue that this evidence is fruit of the poisonous tree. We disagree. It is true that the pager was taken from Swift sometime after he arrived at the station. It may have been seized before probable cause undoubtedly existed at 10:25. However, as our previous discussion makes clear, the police would inevitably have seized Swift's pager at the Jeep had he been kept there, as he could have been, until Sherbun arrived. Regardless whether the pager was seized at the station or at the site of the Jeep, when it revealed Richmond's telephone number, Swift would have been in legal custody for 7 hours. We see no realistic scenario under which the police would not have had the pager at the time the telephone call came in, even if Swift was not taken to the station at 10:10 a.m. The pager and the evidence to which it led are not fruit of the poisonous tree.

But we also conclude that the evidence would have inevitably been discovered. Evidence which is discovered by tainted police action is not suppressed if it would have been inevitably discovered even without the illegal act. Nix v. Williams. Here, the Jeep was stopped leaving the Hickory Village apartments, the police investigation focused on that area, and independent of taking the suspects to the

station, the police had evidence in their possession which would have led them to the Richmond apartment. They had a key ring from the Jeep. On that ring was a key to Richmond's apartment. Hickory Village personnel were able to match apartments to keys. Given the alert law enforcement work evidenced in this case, the police in all likelihood would have found the apartment and Ms. Richmond without the pager by use of the key. The pager, of course, made this task a lot easier, but that doesn't significantly reduce the chance that Richmond's apartment would have inevitably, and fairly soon, come to the attention of the investigators.

We also note that Taylor's claim fails for another reason. The Fourth Amendment is "a personal right that must be invoked by an individual." Minnesota v. Carter, 119 S. Ct. 469, 473 (1998). A defendant must show a violation of "his (and not someone else's)" rights. At 472. Here, for instance, the discovery of the evidence in the Richmond apartment resulted from the seizure of Swift's pager. It did not flow from Taylor's arrest. Taylor cannot assert that the seizure of the pager violated his personal rights. The evidence that the government wants to use would have been captured even if Taylor had been immediately released and allowed to go his merry way after the Jeep was stopped. Nothing, therefore, leading to the search of the Richmond apartment can be traced to Taylor's detention, legal or not.

Suppression of evidence in this case rests on a single possible misstep--that Swift and Taylor were transported to the police station about 15 minutes too early; they should have been held at the scene. That is the only misstep in the case. And misstep aside, the evidence would have been inevitably discovered if all the rules had been followed to the letter. Sherbun certainly knew enough to order his officers to continue the Terry stop for an extra 15 minutes while he traveled to the scene. Had they done so, Sherbun would have arrived, seen the incriminating duct tape and foam earpiece, and the collective knowledge of the officers on the scene in communication with one another would have provided probable cause for the arrest. By the time the pager revealed Richmond's telephone number, which led to the money, Swift and Taylor were properly in custody. The evidence should not have been suppressed. The decision of the district court is

REVERSED.