**UNITED STATES of America,
Plaintiff,**

v.

**Michael SWANSON, Defendant.**

No. 00–30018.

United States District Court,
C.D. Illinois,
Springfield Division.

July 11, 2001.

Patrick J. Chesley, U.S. Atty., Springfield, IL, for U.S.

Monroe D. McWard, Taylorville, IL, Jeffrey T. Page, Noll Law Office, Springfield, IL, for Michael Swanson, defendant.

David B. Mote, Fed. Public Defender, Springfield, IL, for Lee C. Walton, defendant.

## ORDER

SCOTT, District Judge.

This case is before the Court on Defendant's objections to Magistrate Judge Cudmore's Report and Recommendation on Defendant's Motion to Suppress Evidence (d/e 53). Pursuant to this Court's referral, Magistrate Judge Cudmore conducted an

evidentiary hearing on the Motion to Suppress Evidence and issued his Report and Recommendation (d/e 61). Defendant filed timely objections to the Magistrate Judge's Report and Recommendation, and the parties have filed briefs with this Court. This Court has reviewed a transcript of the evidentiary hearing, the written arguments filed by the parties, and the Magistrate Judge's Report and Recommendation and has considered the issues raised pursuant to a de novo standard of review. For the reasons stated below, the Court accepts in part and rejects in part the Report and Recommendation. The Court allows the Motion to Suppress with respect to Swanson's statement given at the Alton Police Department and with respect to the hair and saliva samples (without prejudice to the grand Jury's right to issue another subpoena) and denies the motion in all other respects.

## FACTS

At approximately 9:10 A.M. on January 6, 2000, the Citizens National Bank in Bunker Hill, Illinois, was robbed of $2863 by two black males who wore masks. One of the robbers had a gun and fired a shot during the robbery. Mr. John Jarden (Jarden) saw the robbers leave the bank and run to a maroon colored, older model vehicle (early 80's), which he believed was either a Plymouth or Chrysler product, and make their escape. Jarden told police the vehicle had four headlights and four doors. Jarden described the men as 5′10″ to 6′ tall. He indicated that one of them was wearing a jacket with two pockets on top and two pockets on the bottom; he was unsure of the color but thought it was faded brown or green.

Another person outside the bank, Mr. Charlie Day (Day), stated that one of the robbers wore a dark gray coat, dark pants and some type of head covering. Day described the other individual as wearing a light colored coat, possibly black or gray.

Day described the men as being approximately 6′ tall.

Mrs. Norma Botterbush, who was across the street from the bank, told officers that both perpetrators wore long coats and that one of the coats was purplish. Mr. Alan Moore, the President of the bank, said one of the robbers wore green coveralls. Several of the witnesses inside the bank indicated that the robbers wore gloves and Ms. Lara Dively, a witness inside the bank, said that the perpetrators work masks covering their faces, with the eyes cut out.

During the robbery, one of the robbers jumped onto a counter in the bank and left a shoe print on the counter. The print was raised and secured by Illinois State Police crime lab technician Carter; a sketch of the print was made by FBI Agent Adams. About 11:15 A.M. a Macoupin County Sheriff's Deputy found three gloves, a ski mask, and some black clothes off a country road near Bunker Hill, about five minutes away from the bank (northwest of the bank). The next day officers found a purple coat alongside a country road near Bunker Hill, Illinois.

At 9:27 A.M. on January 6, 2000, a police ISPERN Broadcast was made which said that the bank in Bunker Hill had been robbed and further indicated "small maroon vehicle, two black males, blank shots fired." Alton police Sgt. David Hayes (Hayes) said he heard a later ISPERN broadcast, ten minutes after the first, that stated the vehicle had four front headlights and that the robbers were wearing dark clothes. No one else testified to having heard the second ISPERN broadcast. The witnesses did not provide any license plate number.

At 10:55 A.M. that same day, Alton police officer Winka and probationary police officer Alexander saw a maroon 1981 Pontiac Gran Prix pass them in Alton. They

observed that the vehicle had a cracked windshield and an expired registration sticker and that there were three black males in the car. Winka and Alexander had heard the 9:27 A.M. ISPERN broadcast about the bank robbery in Bunker Hill. They stopped the vehicle, according to Alexander, only for the traffic offenses. Winka asked the driver for his license and proof of insurance; Alexander testified that the driver (Defendant) provided an expired driver's license to Winka. (Swanson was later ticketed for not having a valid driver's license on his person rather than driving on an expired license.) The others in the car had no identification on their persons, but they verbally identified themselves as Myron Zollicoffer and Anthony Carrothers (later determined in fact to be Lee'C Walton). All three of them told officers they lived in the Shipman, Illinois, area, which is near Bunker Hill. Alton, where the vehicle was stopped by police, is 22–25 miles from the bank in Bunker Hill.

Alexander testified that prior to the stop he and Winka did not discuss that the occupants of the car might have been involved in the robbery; he said the only reason for the stop was the traffic offenses they had observed. However, Alexander added that after he learned that the occupants of the car were living in the area of Bunker Hill, the ISPERN broadcast entered into his thinking.

Shortly after the traffic stop was made, other officers arrived to provide back up for Winka and Alexander. Those officers were officers Penny, Botterbush, and Sgt. Hayes. Winka told Hayes he suspected that the occupants might have been the ones who had committed the Bunker Hill bank robbery. Hayes recognized Defendant Swanson from an earlier police investigation and knew that he had been arrested in Shipman, Illinois in 1995 for a shooting. Hayes also recognized Zollicof-

fer as someone the police had previously investigated for trafficking drugs in the area. Hayes expressed a concern that the three in the car might be armed and told Winka to remove them from the car and pat them down. Before the time that officers patted down the three, officers had learned from them that they lived in the Shipman area.

Winka patted down Defendant Swanson and found a bulge in his back pocket. Winka asked what it was, and Swanson said it was his money. Winka asked Swanson if he could remove it to see what it was and Swanson agreed. Winka removed a large wad of money from Swanson's pocket, thumbed through it, and then replaced it in Swanson's pocket. The other two passengers were patted down and found to have similar bulges of money on their persons. Winka then checked the car to make sure there were no guns in the passenger area; he found no weapons but did see a dark colored coat and a black stocking cap (according to Hayes). Hayes then radioed his headquarters and asked them to contact the FBI and Macoupin County authorities. Within five minutes Hayes was notified by radio that the FBI and Macoupin County authorities were sending agents from the scene of the robbery to the location of the stopped vehicle. Hayes had each of the three occupants of the maroon car handcuffed and placed in a different squad car to wait for the FBI agent to arrive.

Shortly after 11:00 A.M. Det. Scott Golicke of the Alton police department arrived. The three from the maroon car had already been handcuffed and placed in separate squad cars before he arrived at the location. At 11:15 A.M. Golicke advised Defendant Swanson of his *Miranda* rights, and Defendant agreed to talk with him. Swanson stated that he had $1500 on his person and that various females had given

the cash to him. He just shrugged when asked why females would have given him that cash. He also said he had never left Alton that day, that he had been to the Alton Square Mall, and that he had not been to Royal Lakes that day. Royal Lakes is a small community located near Bunker Hill and Shipman; it is five miles north of Bunker Hill.

At 11:25 A.M. Golicke interviewed Carrothers (Walton). After *Miranda* warnings were given, Carrothers said he had $600 on his person and that he had earned it through his employment. He stated that Swanson and Zollicoffer had picked him up, a couple hours before the traffic stop, in Shipman, Illinois. He indicated that when he said Shipman he really meant Royal Lakes. During the interview, he changed his mind as to whether Zollicoffer was in the car at first.

At 11:33 A.M. Golicke interviewed Zollicoffer. He said he had $260 or $280 that he had obtained from employment. He said that Swanson and Carrothers had picked him up at his girlfriend's residence an hour before the traffic stop and that the three had gone to the Alton Square Mall.

About 11:45 A.M. Golicke was advised by his supervisor to leave the balance of the investigation to the FBI. Golicke then left the scene. FBI agent Schlobohm arrived at the location of the traffic stop at Noon. Schlobohm had been at the bank when he received word of the traffic stop in Alton. Before he proceeded to the traffic stop in Alton, he obtained from the bank a bait list, or list of serial numbers of some of the bills taken in the robbery. He also took with him Agent Adams' sketch of the shoe print. He had been advised by other officers at the bank of the descriptions given by the witnesses of the robbers. Upon arriving at the scene of the traffic stop, he viewed the three individuals sitting in the squad cars and thought they fit the heights of the descriptions given of

the robbers. He thought the clothing also matched the descriptions given by witnesses. He then directed that the three be taken to the Alton Police Department. The vehicle was towed from the scene at 12:15 P.M.

At the time of the stop in Alton, Swanson was wearing or had a black stocking cap, a white T-shirt under a black T-shirt, black jeans, and brown hiking boots; he was 5'9". Zollicoffer was wearing or had a green stocking cap, white sweatshirt, khaki pants, and hiking boots; he was 5'8". Carrothers (Walton) was wearing or had a black stocking cap, gray long sleeve Illinois sweatshirt, black jeans, and black sneakers; he was 5'8".

Once at the station, the FBI separately questioned each occupant. From 12:20 P.M. until 1:00 P.M. Schlobohm and Lovejoy questioned Zollicoffer. He told the officers that he had been picked-up by Swanson and Walton from his girlfriend's house in Alton between 9:30 A.M. and 10:00 A.M. From there the three of them stopped at a convenience store and went to the mall. Zollicoffer said that some of the money he had came from Swanson, who repaid money borrowed earlier from Zollicoffer.

From 1:15 P.M. until 2:00 P.M. Schlobohm and Lovejoy questioned Carrothers. Carrothers said he spent the night in Bunker Hill and that Swanson picked him up at 10:00 A.M. Then he and Swanson stopped at a store, bought a sweatsuit, and then picked up Zollicoffer in Alton. Later he changed his story, saying they picked up Zollicoffer first and then bought the sweatsuit before going to the mall. Walton at some point began asking questions about federal prison facilities, cooperation, and then asked for a lawyer. Evidently, not hearing Walton's request for an attorney, Lovejoy continued talking with Walton, who admitted his involvement with the

Bunker Hill Bank robbery, but would not implicate his accomplice.

At 2:00 P.M. FBI agents Kathleen Adams and James Thurston questioned Defendant Michael Swanson. Swanson gave verbal permission for the agents to search the car. He was advised of his *Miranda* rights and Swanson agreed to talk to the agents. He stated that he had been at his home in Royal Lakes prior to picking up Walton and Zollicoffer at their homes in Royal Lakes. All three then came to Alton when they were stopped by the police. Swanson stated that they made no stops. He denied any involvement with the robbery and at 2:15 P.M. invoked his right to counsel.

A search of the car revealed a black coat with four pockets, which matched a description of the style (but not the color) of coat given by one of the witnesses. All three individuals consented to a review of their money. No serial numbers matching the bait bills from the bank were found; however, four of the bills were unique. One twenty dollar bill (found on Zollicoffer) had vulgar language written on it and was identified by a bank teller later that afternoon and by a bank customer who originally brought the bill to the bank. Two bills that were badly faded (found on Swanson) and were also identified by the bank teller. Lastly, a five dollar bill that was a unique color of bright green (found on Carrothers) was also identified by the teller.

FBI agents spoke with a representative of the U.S. Attorney's Office concerning the investigation. At 6:37 P.M. federal grand jury subpoenas were issued through the U.S. Attorney's Office in Springfield. The subpoenas called for Swanson, Walton, and Zollicoffer to submit samples of head hair, body hair, hand hair, saliva, fingerprints, and photographs. The subpoenas gave each individual the option of complying by submitting samples to law enforce-ment, or appearing on February 2, 2000, at 9:00 A.M. before the grand jury.

All three individuals were taken to St. Anthony's Hospital where the hair and saliva samples were collected. Once the collection was completed, the Alton Police Department finished its processing of each person, and all three were released at 10:15 P.M.

Defendant Swanson received three traffic citations from the stop: operating a vehicle with expired registration sticker, driver's license not on person, and operating uninsured vehicle. Sgt. Hayes testified that a motor vehicle with expired registration cannot be driven and must be towed. He also testified that Defendant Swanson was a "a full custody arrest" on the traffic charges, and, since his driver's license was not available as bail, Swanson could only secure his release by posting cash as bond with the Clerk of the Court. Swanson was given the three traffic citations and released on a notice to appear in court; he did not post any cash bail. According to FBI Agent Adams, Swanson was never arrested for the bank robbery at any point that day.

Based upon a stipulation between the parties, and dialogue with the Magistrate Judge, it is clear that in December of 1998, a grand jury was impaneled in Springfield. Further, that same grand jury sat on January 5, 2000, and would next sit on February 2, 2000. It was also stipulated that the grand jury itself was not involved in any aspect of the grand jury subpoenas issued January 6, 2000. The grand jury had no prior knowledge, and the grand jury gave no prior authorization to issue grand jury subpoenas to Swanson and the others.

### ISSUES

Defendant moved to suppress the statements he gave to police and the evidence obtained from his hair and saliva speci-

mens submitted as a result of the Grand Jury subpoena. He objected to the Magistrate Judge's finding that the police had a reasonable articulable suspicion that the occupants of the maroon car had engaged in criminal activity at the time of the pat down of their persons at the scene of the traffic stop. He further objected to the Magistrate Judge's finding that the investigative detention was appropriate and contends that Swanson was arrested without probable cause when the police officers put handcuffs on him.

Swanson further objected to the Magistrate Judge's conclusion that the Grand Jury subpoena was proper. He contends that he did not truly comply voluntarily with the subpoena and contests the Magistrate Judge's finding that the things produced pursuant to the Grand Jury subpoena would have inevitably been discovered. He contends that all evidence and statements of his are "fruit of the poisonous tree" and must be suppressed.

## ANALYSIS

### A. Initial Stop of Vehicle

■ The Court notes that Defendant Swanson does not contest the validity of the stop of the vehicle. The Court agrees with Magistrate Judge Cudmore's finding that there was probable cause for the traffic stop based on the officers' observation that the car had an expired registration sticker. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), indicates that if the officers also were mindful of the report of a maroon car being used to flee from a bank robbery and stopped the vehicle to investigate that as well, the stop is still proper due to the expired registration. This Court accepts and adopts Magistrate Judge Cudmore's analysis concerning the initial stop of the vehicle.

### B. Terry Stop

■ Defendant argues that at the time of the pat down of his person at the scene of the traffic stop the police lacked a reasonable articulable suspicion that he had engaged in (or was engaging in) criminal activity. The Court disagrees. At the time of the pat down of Swanson, the police knew of the bank robbery (one hour and forty five minutes earlier) in Bunker Hill (22–25 miles away); they knew the robbers were two black males who had fled in a maroon car; they knew a shot had been fired in the robbery; they knew Swanson and the other two occupants of the maroon car were black males who lived in the area of Bunker Hill; and they knew that Swanson had previously been involved in a shooting and that one of the others was known to police for illegal drug activity. The Court finds that those facts satisfy the requirements of reasonable articulable suspicion to justify a Terry detention and pat down. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When the pat down of the three from the maroon car was conducted, the police found they were in possession of a substantial amount of cash. At that point, the police had additional suspicion that the three had been involved in the Bunker Hill bank robbery and were warranted in holding them at the scene until agents investigating at the bank could come to the scene of the traffic stop.

■ The fact that Swanson was handcuffed and placed in the back of a police car did not transform the investigative detention into an arrest. See U.S. v. Perdue, 8 F.3d 1455 (10th Cir.1993); US v. Tilmon, 19 F.3d 1221 (7th Cir.1994); Pliska v. City of Stevens Point, 823 F.2d 1168 (7th Cir. 1987).

■ This Court accepts that part of Magistrate Judge Cudmore's report concerning the Terry stop or pat down. Like-

wise, the questioning of Swanson while he was seated in the rear of the squad car did not transform the investigatory detention into an arrest. The questions asked by Det. Golicke were preceded by *Miranda* warnings and were limited to where had he been, how much money did he have and where did the money come from. Those questions went to conforming or dispelling the officers' suspicions concerning Swanson's involvement in the bank robbery and were proper as part of the investigatory detention. *See U.S. v. Scheets,* 188 F.3d 829 (7th Cir.1999); *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

### C. *Investigative Detention and Probable Cause*

■ The Court is of the opinion that an arrest (as opposed to an investigative detention) occurred at Noon when the FBI agent directed that Swanson be taken to the Alton Police station. At that point officers had a lot of suspicion that Swanson may have been involved in the bank robbery but not enough evidence to constitute probable cause. Although Agent Schlobohm testified that he observed the three individuals in the police cars at the scene of the traffic stop and found them to be similar in size and wearing similar clothing as the robbers, it appears that his conclusions was based on the interviews other officers had conducted with the witness described in *Facts* above. Those descriptions of clothing varied, at least in color, considerably. Although Swanson and the other two were approximately the same height as the robbers, so are many in the general public. This Court agrees with Magistrate Judge Cudmore's finding that probable cause for the arrest of Swanson for the armed robbery did not arise until 2:00 P.M. when Carrothers (Walton) admitted that he was one of the robbers. Even though Carrothers' (Walton's) admission may be subject to constitutional chal-

lenge by Carrothers, Swanson would have no standing to challenge it. That statement, coupled with the other things then known to the police, would have given the police probable cause to arrest Swanson for the bank robbery. Carrothers' inculpatory statement was not until 2:00 P.M., however, and it was not until that point that any of the three were actually tied to the bank robbery.

■ The resulting issue, then, is whether the custodial detention of Swanson from Noon until 2:00 P.M. was valid. The Court is of the opinion that the officers could have kept Swanson and the other two at the scene of the traffic stop arguable until 1:00 P.M. in order to permit Technician Carter time to lift the shoe print from the bank counter and drive to Alton to compare the print to the three individuals' shoes. That was accomplished by 1:00 P.M.; the print did not match the shoes of any of the suspects. Under the circumstances, the ability to compare the print to the shoes worn by the three could have been lost forever if they were not detained long enough for that comparison to be made. If Swanson could have been detained at the scene of the traffic stop until 1:00 P.M., then it is immaterial that he had been transported to the Alton police station before 1:00 P.M. *See U.S. v. Swift,* 220 F.3d 502 (7th Cir.2000). A decision to take the Defendant to the police station, rather than keeping him at the scene of the stop until Carter compared the print to his shoes, thus, is not critical for the first hour.

■ The Court cannot find a valid basis for the police to have detained Swanson beyond 1:00 P.M. however. By that time the police knew, or should have known that the serial numbers of the money possessed by the three suspects did not match the bait money from the bank; the shoe print lifted from the scene did not match that of

a shoe worn by any of the three; and, apparently, there were no witnesses who could be expected to make an identification. While the Court finds it understandable that law enforcement would want to investigate these three further as possible suspects, their investigation should have proceeded without detaining the three beyond that point.

The Court is mindful that *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) authorizes the police to arrest an individual who has only committed minor traffic offenses in his presence. Thus, taking Swanson to the Alton police department for his traffic violations was warranted. However, even though *Atwater* authorized the police to take Swanson into custody for the minor violations, it did not authorize the continued detention of him beyond a reasonable time to write the citations and admit him to bond. Illinois, by Supreme Court rule, has provided a schedule of bonds for minor traffic offenses so that minor traffic offenders can be released without being taken to Court. *See* Illinois Supreme Court Rules 503, 526. Pursuant to those rules, the officer may take a valid driver's license as bond (Swanson did not have one with him), or release a defendant on his promise to appear or notice to appear, or release him on a cash bond in accordance with the schedules set out in the rules. Swanson and his companions had more than enough cash with them to post any cash bond provided by the Illinois Supreme Court Rules for the traffic offenses with which Swanson was charged. Interestingly, when the police ultimately did release Swanson, they did so by giving him a notice to appear on the traffic charges without requiring him to post any cash. In any event, the Court cannot justify the holding of Swanson in custody beyond 1:00 P.M., either for investigative detention of the bank robbery or for the arrest on the traffic violation. Filling out the citations

should easily have been completed before 1:00 P.M.

 The Court, therefore, differs with the Magistrate Judge's analysis in this part of the report and the remaining portions of the report. The Court finds that evidence obtained from Swanson (and no other source) after 1:00 P.M. should be suppressed as fruit of the unlawful detention. The evidence found in a search of the vehicle, however, is proper since the vehicle needed to be towed and an inventory prepared of the contents. The Court grants the Motion to Suppress with respect to the statement Swanson gave at the Alton Police Department after 2:00 P.M. and the evidence gained from his hair and saliva samples. For the reasons stated below, the Court finds that the Government has not shown that those items of evidence were discovered from an independent source or that they would have initially been discovered without the unlawful detention so as to purge the evidence of the primary taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States ex. rel. Owens v. Twomey*, 508 F.2d 858 (7th Cir. 1974); *United States v. Swift*, 220 F.3d 502 (7th Cir.2000).

D. *Grand Jury Subpoena*

 The Grand Jury subpoena served on Swanson for his hair and saliva was issued by the U.S. Attorney, without advance knowledge or authorization of the grand jury. The Government has pointed to *United States v. Santucci*, 674 F.2d 624 (7th Cir.1982) for the proposition that the U.S. Attorney can issue Grand Jury subpoenas, without prior Grand Jury authorization and permit compliance to be made outside the Grand Jury. *Santucci* involved a Grand Jury subpoena for handwriting samples, fingerprints and photographs of an individual and authorized the subpoe-

naed party to comply by furnishing the subpoenaed things directly to law enforcement agents rather than the Grand Jury. The Government has argued that the issuance of the Grand Jury subpoena to Swanson in this case complied with the procedure outlined in *Santucci*, that Swanson consented to going to the hospital to submit the requested hair and saliva samples to law enforcement, that he has consequently waived his right to object now, and finally that even if the Court found that the evidence obtained by the Grand Jury subpoena was tainted by an unlawful detention, that it would inevitably have been discovered later.

First the Court recognizes the authority of *Santucci*. There are several factual differences between Swanson and *Santucci*, however. Swanson was in custody when police served the subpoena on him; Swanson was not represented by legal counsel at the time and was not told of any legal process by which he could challenge the subpoena; Swanson had not yet appeared before a Judge on any charges; the items sought by the subpoena implicated Swanson's Fourth Amendment rights. Santucci was not in custody when he was served with the subpoena; he had legal counsel; he availed himself of legal process in an attempt to quash the subpoena before complying; and the items sought from him involved no bodily intrusion.

In order for there to be an effective waiver of the right to challenge the subpoena now, there must be some showing of voluntary compliance with the subpoena. Voluntariness is not shown by mere acquiescence to authority. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). There is nothing in the record to suggest that Swanson had any knowledge of a procedure by which to challenge the subpoena before he complied. In fact, the evidence was to the contrary. Agent Adams, the FBI agent who served the subpoena, testified as follows:

Q: This Grand Jury subpoena, that was issued on January 6th, is that correct?

A: Yes.

Q: And I believe you testified that there was a provision on the subpoena that discussed compliance with the subpoena; is that correct?

A: That is correct.

Q: Apparently Mr. Swanson had the option of either complying by providing samples to the agents on January 6th or providing those samples when the Grand Jury met on February 2nd; is that correct?

A: That's correct.

Q: So he had an option at that point as to how he was going to comply, correct?

A: That's correct.

Q: But he did not have an option as to compliance in general, correct? In other words he had to comply, it was just how he was going to comply?

A: That's correct.

Q: The Grand Jury subpoena certainly authorized him to give those samples, is that correct?

A: That's correct.

Q: He didn't have a choice in that matter, did he?

A: No sir.

*Transcript of Suppression Hearing*, pages 60–61,

When a pro se defendant, who had requested counsel nearly four hours earlier and who had been detained nearly eight hours, is given a subpoena for bodily substances and presented with a "Hobson's Choice" of complying now or later before

the Grand Jury, it cannot be said that he has voluntarily complied and waived his right to challenge the subpoena by giving the samples law enforcement requested of him. He, unlike the person who was at liberty when served with a subpoena, should at least have the opportunity to challenge the validity of the subpoena after the sample has been taken.

In this case, there were no exigent circumstances that required the Government to act immediately for fear the items subpoenaed would be lost. The bodily hair and saliva would still have been available if Swanson has been given notice and a meaningful opportunity to challenge the subpoena. That is part of the analysis on which the Court in *In re Grand Jury Proceedings Involving Vickers and Haas*, 38 F.Supp.2d 159 (D.N.H. 1998) (cited by the Government herein) relied. This Court has no quarrel with the analysis of *Vickers and Haas*. This Court agrees with its conclusion that a subpoena for saliva does implicate Fourth Amendment rights, although not to the extent that a request for bodily substances requiring a more invasive procedure does.[1] This Court agrees that a Grand Jury may issue a subpoena which is reasonable under the circumstances (something less than a probable cause standard). When a person's Fourth Amendment rights are implicated, however, the subpoenaed party should be given at least some opportunity to challenge the subpoena, in the absence of exigent circumstances. That opportunity was not afforded Swanson; this Court will not find that he complied voluntarily under the circumstances and waived his right to challenge it now. The Court will entertain his challenge.

The final prong of the Government's argument is that this Court should not quash the evidence gained from the Grand Jury subpoena because the same evidence would have been inevitably discovered later. The Government argues that even if the Court suppresses the evidence, the Grand Jury could issue another subpoena for the same items now.

The Court agrees with the Government's contention that the Grand Jury could issue another subpoena for Swanson's hair and saliva samples, even now. The Court hesitates to rule on the present record, that the evidence gained from the Grand Jury subpoena on January 6, 2000, would inevitably have been discovered. In arguing the motion to suppress, the Government · attorney suggested that the items found by the side of the road on the day of the robbery contained materials suitable for DNA comparison; the evidence presented during the hearing, however, did not address that issue. Thus, it is difficult for this Court now to engage in the balancing test contemplated by *Vickers and Haas*. This Court cannot say with any degree of certainty what the Grand Jury might do. Under the unique facts of this case, the Court believes the more prudent course would be to have the Grand Jury issue another subpoena, if it wishes. Swanson is now represented, and if he feels the subpoena is unreasonable under the circumstances, he may file a motion to quash it. The evidence, if warranted, could still be obtained consistent with a procedure that balances Swanson's rights with the Grand Jury's legitimate need to investigate criminal activity.

THEREFORE, the Court accepts in part and rejects in part the Magistrate

---

**1.** In *Skinner v. Railway Labor Executives Ass'n.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) the Court found that a subpoena for a deep breath sample implicated Fourth Amendment rights. It would seem that a subpoena for a saliva sample would be in that same category of things and also implicate Fourth amendment rights.

Judge's Report and Recommendation. Defendant's Motion to Suppress (d/e53) is allowed with respect to Swanson's statement given at the Alton Police Department, allowed with respect to the hair and saliva samples (without prejudice to the Grand Jury's right to issue another subpoena) and denied in all other respects.