**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Reginald THOMAS, Defendant–**
**Appellant.**

No. 02–3386.

United States Court of Appeals,
Seventh Circuit.

Argued July 9, 2003.

Decided Oct. 23, 2003.

Jeff Cramer, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Scott J. Frankel, Frankel & Cohen, Chicago, IL, for Defendant–Appellant.

Before BAUER, COFFEY, and MANION, Circuit Judges.

## ORDER

Reginald Thomas was arrested after police spotted him driving a car matching the getaway vehicle used in a spree of bank robberies in the Chicago area. Numerous victims identified Thomas as the bank robber at trial, and a jury convicted him of eleven counts of bank robbery, 18 U.S.C. § 2113(a). Thomas appeals his convictions, arguing (1) that the police lacked probable cause to arrest, and (2) that the district court erred in allowing the government to impeach him at trial with the fact that he had prior felony convictions. We affirm.

## I. Background

Eleven banks in the western suburbs of Chicago were robbed over a three-week period in late December 2000 and mid-January 2001. The robber, whom law enforcement dubbed the "Paper Bandit," entered the banks in the morning or early afternoon carrying a stack of papers, handed the tellers an envelope upon which he had written "This is a robbery," and demanded cash. Witnesses similarly described the robber as a middle-aged black man who was approximately 6 feet tall, weighed about 160 to 170 pounds, and had short hair graying on the sides, a pronounced nose, and slight facial hair. According to the witnesses, the man wore

sunglasses with gold earpieces during the robberies. Several witnesses also saw the robber's getaway car, which they described to police as a dark-colored, late 1980's model Dodge Dynasty or Diplomat with no license plates but bearing a temporary "license applied for" sticker in the rear window.

On January 23, 2001, an officer of the Village of Elk Grove, Illinois, police department named Stephen Prindle was monitoring the parking lot near a local bank in the hopes of spotting the "Paper Bandit" when a black Dodge Dynasty with a temporary "license applied for" sticker in the rear window drove by the bank. Officer Prindle noticed that the driver, who turned out to be Reginald Thomas, was a short-haired, black male wearing sunglasses with gold earpieces. Suspecting that Thomas might be the bank robber, Prindle began following him in his unmarked squad car. Prindle decided to stop Thomas after observing him repeatedly glance towards the bank and make two improper left turns, one without signaling and another from the center lane.

Officer Prindle, with the assistance of another squad car, stopped Thomas's car, and the officers ordered Thomas, the vehicle's lone occupant, out of the car at gunpoint. Once Thomas stepped out of the car, Prindle confirmed that he indeed matched the physical characteristics of the "Paper Bandit" insofar as he was an African–American in his forties, 6 feet tall, 160 pounds, and had short hair graying on the sides, a wide nose, and slight facial hair. The officers ordered Thomas to walk backwards towards them and kneel down on the ground. Thomas complied with their orders, and Prindle handcuffed him and patted him down. While being handcuffed, Thomas gave Prindle his name and explained that he was in the area looking for a job.

Thomas was then placed in a squad car. Shortly thereafter Prindle's boss, Sergeant Kirkpatrick, told Prindle to have Thomas's car towed and instructed another officer to transport Thomas to the police station, which he did. Prindle stayed behind and performed what he described as a "cursory check" of the passenger compartment of Thomas's car for weapons or anything else that might jeopardize the tow truck driver's safety. He did not find any weapons but did discover two crack pipes under a towel on the hump between the front seats. He also observed Thomas's sunglasses with gold trim on the dashboard as well as two other pairs of sunglasses on the car seat.

Back at the police station, the officers informed the FBI that they had a suspect in custody who matched the description of the "Paper Bandit" and ran a background check on Thomas, which revealed an active warrant for his arrest on an outstanding traffic ticket in DuPage County. Later that day the officers photographed Thomas and put his picture in an array with photos of five other similar-looking men. That evening FBI agents showed the photo lineup to several robbery victims, who identified Thomas as the bank robber. Meanwhile, Thomas's car was impounded, and the Elk Grove police inventoried its contents, as is the department's policy in cases of vehicular arrests to guard against claims of lost or stolen property. The inventory search of Thomas's car garnered several items that were later used to tie him to the bank robberies, most notably the three pairs of sunglasses, two coats, a green checkbook, and receipts for thousands of dollars of merchandise purchased by Thomas in cash during December 2000 and January 2001.

The next day Thomas was turned over to federal law enforcement officials, and three weeks later, on February 20, 2001, a

federal grand jury returned an indictment charging him with eleven counts of bank robbery. Before trial Thomas moved to quash his arrest and to suppress the evidence found in his car, the photographic line-up, and any testimony regarding the photo line-up identifications. Thomas argued that the police lacked probable cause when they arrested him for the bank robberies at the scene of the traffic stop based solely on the general description of the robbery suspect. The government, in turn, contended that Thomas was not technically "under arrest" when he was brought to the police station, but even if he were, the fact that Thomas looked like the suspected robber, was wearing similar sunglasses, and was driving a nearly identical car was sufficient to establish probable cause. In addition, the government claimed that the traffic violations observed by Officer Prindle established probable cause to arrest as did the subsequent discovery of the crack pipes and the outstanding arrest warrant.

The district court denied Thomas's motion. Relying heavily on *United States v. Tilmon*, 19 F.3d 1221 (7th Cir.1994), the court concluded that the similarities between Thomas's appearance and the victims' descriptions of the robber and his car established probable cause to arrest. Accordingly, the court did not reach the issue whether the arrest, as well as the search and photo identifications that followed, might also have been justified by the traffic violations, the discovery of the crack pipes, or the outstanding warrant.

At trial, witnesses from each of the banks identified Thomas in court and from the photo line-up as the robber. Witnesses also identified the clothing, sunglasses, and green checkbook found in Thomas's car as belonging to the robber. Bank surveillance videos of the robberies were also shown to the jury. Thomas testified in his own defense and professed his innocence. Before testifying, he moved to preclude the government from cross-examining him about his prior criminal record–namely, convictions in 1984 for theft by deception, burglary, robbery, theft, and receiving stolen property. Because Thomas was not released from prison for those offenses until 1996, he conceded that they fell within the ten-year time period for admissibility under Fed. R.Evid. 609. But, he argued, because the convictions were nearly twenty years old and the nature of the crimes were similar, their prejudicial effect outweighed their probative value. The court granted the motion in part and denied it in part, allowing the government to elicit that Thomas had been convicted of theft by deception but bring up only that he had four other felony convictions. When Thomas took the stand, the government cross-examined him regarding the theft by deception conviction and whether he had four additional felonies.

The jury found Thomas guilty on all eleven counts, and the district court sentenced him to concurrent 230–month prison terms.

## II. Analysis

### A. Probable Cause to Arrest

On appeal, Thomas maintains that the police lacked probable cause to arrest him, and thus the district court should have suppressed the fruits of that arrest–namely, the photo line-up identifications and the physical evidence later found in his car. This court reviews *de novo* the district court's determination that the arrest was lawful, but reviews the factual findings underlying that determination only for clear error. *United States v. Scheets*, 188 F.3d 829, 835–36 (7th Cir.1999). To make an arrest, a police officer needs probable cause, which exists if "the totality of the facts and circumstances known to a rea-

sonable arresting officer would support the belief that the suspect has committed or is committing a crime." *Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002). Probable cause does not require evidence sufficient to support a conviction. "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir.2001). On the other hand, the police may stop and briefly detain someone for further investigation without probable cause if they have a reasonable, articulable suspicion that the person is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Swift*, 220 F.3d 502, 506 (7th Cir.2000). "Reasonable suspicion" is something less than probable cause but something more than a mere "hunch." *Swift*, 220 F.3d at 506.

Thomas does not dispute that the police had reasonable suspicion based on the witnesses' descriptions of the robbery suspect and his car to stop Thomas in order to investigate whether he might, in fact, be the bank robber. But Thomas contends that this "stop" quickly evolved into an custodial arrest when the police forced him out of the car at gunpoint, ordered him to walk backward and kneel on the ground, and handcuffed him. This "arrest" was made, he says, before police had any specific evidence tying him to the bank robberies or any other crime.

In *Tilman* we held that an intrusive stop like the one the police made in this case is not tantamount to an arrest when the police have reason to believe that the suspect is armed and dangerous. 19 F.3d at 1225–28; *see also Swift*, 220 F.3d at 509. Other circuits are in agreement. *See, e.g., United States v. Heath*, 259 F.3d 522, 529–30 (6th Cir.2001); *United States v. Campbell*,

178 F.3d 345, 349–50 (5th Cir.1999); *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir.1998). As the district court correctly concluded, *Tilmon* is on all fours with this case. In *Tilmon*, the police stopped a car matching the description of the getaway car in a bank robbery. As in Thomas's case, the police surrounded the car, ordered the driver out at gunpoint, ordered him to lie down, and handcuffed him. This court held that this show of force did not transform the valid *Terry* stop into an arrest because the police had reasonable suspicion to stop the car in order to get a closer look at the driver, and the officers' tactics were justifiable to protect themselves and passers-by from a potentially armed and dangerous bank robbery suspect. The officers used similar security measures in Thomas's case because they considered the "Paper Bandit" –who had brazenly robbed eleven banks–armed and dangerous, particularly since during some of the robberies he had intimated that he had a weapon, though he never displayed one. Under *Tilmon*, the initial stop of Thomas did not amount to an arrest requiring probable cause.

■ The stop matured into an arrest, however, when Thomas was involuntarily transported in handcuffs to the police station. "A seizure becomes an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir.1999) (internal quotations omitted). Forcibly taking a suspect from the scene of a traffic stop to the police station is typically considered a formal arrest under the Fourth Amendment. *Swift*, 220 F.3d at 508; *see also Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1846–47, 155 L.Ed.2d 814 (2003) (involuntary transport to police sta-

tion for questioning is an arrest within the meaning of the Fourth Amendment).

■ The question, then, is whether there was probable cause for an arrest at the time Thomas was taken from the scene to the police station. We believe that there was. Thomas argues that the fact that he matched the general description of the robber and his car, without more, was insufficient to establish probable cause. But, again, *Tilmon* dictates otherwise. In *Tilmon* we concluded that the police had probable cause to arrest the defendant after he stepped out of his car and the officers confirmed that he matched the description of the bank robbery suspect given over the police radio. 19 F.3d at 1228. That information, we reasoned, was sufficient to justify an arrest when considered along with the defendant's distinctively marked car, a blue Mustang with a grey stripe and Minnesota license plates. Similarly, once Thomas exited his car, Officer Prindle observed that he fit the physical description of the bank robbery suspect in that he was a middle-aged black male approximately 6 feet tall, weighed 160 pounds, with facial features bearing resemblance to the suspect's description. Prindle also was aware that one of the witnesses had described the robber as resembling a "sickly Walter Payton," which, Prindle testified, Thomas did. As in *Tilmon*, Thomas's physical resemblance to the robbery suspect, viewed in conjunction with the matching sunglasses and similar vehicle with the distinctive "license applied for" sticker, gave rise to probable cause.

Thomas argues that *Tilmon* is distinguishable because in that case the police spotted the defendant's car just hours after the robbery took place. We are not persuaded. Here, Thomas was seen furtively driving by a bank in the same area and around the same time that the previous robberies were committed. And here the description of the robbery suspect, al-though not especially detailed, was more specific than the description before the police in *Tilmon* of a "young, black male of medium complexion and of medium build and height." Thomas contends that Officer Prindle's testimony that he got a good look at Thomas when Thomas stepped out of his car was not credible. The district court, however, evidently found Prindle believable, and we defer to the court's credibility determinations. *See Scheets*, 188 F.3d at 836.

For the reasons discussed, the district court correctly concluded that the totality of the circumstances established probable cause for Thomas's arrest. In addition, the police would have had probable cause to arrest Thomas for violating the Illinois traffic code for his two improper left turns, 625 ILCS §§ 5/11–801, 5/11–804. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 348–49, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (full custodial arrest permitted for even minor traffic violation). But because probable cause plainly was established when the police observed that Thomas matched the description of the robbery suspect, like the district court, we need not decide whether the traffic violations, or the subsequent discovery of the crack pipes and outstanding warrant, provided the officers with additional grounds for the arrest, or for the admission at trial of the evidence gathered. The motion to quash the arrest and suppress evidence was properly denied.

### B. Admission of Prior Convictions

■ Thomas next argues that the district court erred in allowing the government to impeach him with his prior felony convictions, a decision that this court reviews only for abuse of discretion. *United States v. Smith*, 131 F.3d 685, 687 (7th Cir.1997). Rule 609(a)(1) permits the admission of evidence that a defendant has

been previously convicted of a felony if the court determines that its probative value outweighs its prejudicial effect to the accused. Fed.R.Evid. 609(a)(1). In making that determination, a district court should consider: (1) the impeachment value of the prior crime; (2) the point in time of conviction and the defendant's subsequent history; (3) the similarities between the past and charged crimes; (4) the importance of the defendant's testimony; (5) the centrality of the credibility issue. *Smith*, 131 F.3d at 687.

Thomas does not come close to showing that the district court abused its discretion here. Rather, he asks this court to reweigh the five factors in his favor. He maintains that the impeachment value of his prior convictions was low because the government did not know the specific facts behind the convictions; the convictions were nearly twenty years old at time of trial; and none of his prior convictions was for bank robbery, although one was for robbery. The district court considered those concerns and therefore, besides the theft-by-deception conviction that was admissible regardless of any prejudice, *see* Fed.R.Evid. 609(a)(2), limited the government's cross-examination to the number but not the nature of the prior offenses. Thomas does not indicate how the admission of the number of other convictions, but not their titles, unfairly prejudiced him. He contends that the fourth and fifth factors weigh against admissibility because his testimony was unimportant and his credibility was not at issue. But Thomas's denial that he robbed the banks was directly contradicted by the testimony of numerous eyewitnesses identifying him as the robber. The government therefore was entitled to impeach his veracity with the fact that he is a convicted felon. There was no abuse of discretion here, particularly given that the district court precluded the government from exposing the nature of Thomas's prior convictions.

## III. Conclusion

For these reasons, we AFFIRM the district court's judgment.