UNITED STATES of America, Plaintiff–Appellee,

v.

Randall P. SCHEETS, Defendant–Appellant.

No. 98–4036.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1999.

Decided Aug. 16, 1999.

Thomas A. Keith (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

George F. Taseff (argued), Office of the Federal Public Defender, Peoria, IL, for Defendant–Appellant.

Before POSNER, Chief Judge,
COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After the district court denied his motion to suppress certain evidence, Randall Scheets entered a conditional plea of guilty to one count of bank robbery in violation of 18 U.S.C. § 2113(a) and was sentenced to prison. On appeal, Scheets challenges the district court's denial of his motion to suppress evidence, namely a demand note used during the bank robbery and his written confession, on the ground that the investigating officers obtained the evidence in violation of his constitutional rights. Because we conclude that the officers' actions did not violate Scheets's constitutional rights, we affirm.

## I. HISTORY

Randall Scheets presented a demand note to a teller at First Financial Bank in Peoria, Illinois, and walked away with approximately $900. Special Agent Robert Brown of the Federal Bureau of Investigation and Detective Pat Rabe of the Peoria Police Department investigated the robbery and obtained a detailed description of Scheets from witnesses and photographs developed from bank video surveillance tapes. Agent Brown and Detective Rabe provided the photographs of the suspect to the nearby Par–A–Dice Riverboat Casino with instructions to contact the Peoria Police Department if Scheets turned up there.

Later that evening, Michael Hamlin of the Illinois Gaming Board and Senior Special Agent James Carter of the Illinois Department of Revenue, who were on duty at the Casino, were notified by the Casino's surveillance department that an individual in the Casino matched the photographs of the bank robbery suspect. This individual was Randall Scheets. After watching Scheets from the Casino's surveillance room, Hamlin and Agent Carter determined that sufficient similarities existed between the robber in the photograph and Scheets to warrant additional investigation. Agent Carter followed Scheets throughout the gambling area of the Casino and Hamlin contacted the Peoria Police Department to obtain additional information regarding the identity of the suspect in the photograph.

While observing Scheets in the gambling area, Agent Carter noticed further similarities between Scheets and the suspect in the photograph including his glasses, mustache, cane, and the cupped appearance of one of his hands. Hamlin's conversation with a desk sergeant at the Peoria Police Department confirmed with near certainty that Scheets and the robber in the photograph were the same person. The desk sergeant informed Hamlin that the robber was a white male, around forty-five years old, five feet ten inches tall, and weighing 160 pounds, with a "soft pepper" beard, a limp, and a cane. This description matched Scheets.

At approximately 7:15 p.m., Agent Carter and Hamlin approached Scheets and identified themselves as Illinois Gaming Board agents. After Agent Carter and Hamlin informed Scheets that he matched the description of a bank robbery suspect, Scheets agreed to accompany them to the security office located in a separate part of the Casino. Audio and video surveillance recorded events occurring in this room. While Agent Carter and another officer remained with Scheets, Hamlin advised the Peoria Police Department that Scheets was in the Casino's security office and waited for the arrival of Agent Brown at the pavilion area of the Casino.

Approximately thirty-eight minutes passed between the time Agent Carter and Hamlin approached Scheets and the arrival of Agent Brown. During this time, Agent Carter again told Scheets that he matched the description of a bank robber and that members of the Peoria Police

Department had been contacted and would be arriving shortly to speak with Scheets about the robbery. Throughout their conversation, Agent Carter did not question Scheets about the bank robbery and continuously stressed to Scheets that he was not under arrest and was free to leave at any time. When Scheets actually attempted to leave the security office to return to the gambling area, however, Agent Carter instructed Scheets to remain in the office because Agent Brown would be arriving within minutes.

At 7:53 p.m., Agent Brown arrived at the security office and began to question Scheets after Scheets agreed to speak with him. In response to Agent Brown's questions, Scheets relayed general background information regarding where he was staying and what he had done throughout the day. Scheets also told Agent Brown that he owned a trench coat (as did the bank robbery suspect) and that he had been drinking during the afternoon. He also provided Agent Brown with a description of his car. Scheets permitted Agent Brown to inspect the approximately $800 he was carrying, but refused Agent Brown's requests to continue the interview at the police station and to search his car. During the course of their conversation, Scheets also admitted that he had been previously arrested for bank robbery.

At some point during this initial interview, Agent Brown contacted Detective Rabe and directed him to meet them in the Casino's parking lot. Agent Brown then suggested to Scheets that they should leave the security office and wait outside in Brown's car for Detective Rabe to arrive. Perhaps sensing the jig was about up, Scheets told Agent Brown, "I don't like the emphasis I'm getting" and rejected Brown's offer to wait outside. Relying on Agent Brown's statement that he was not under arrest and was free to go, Scheets told the investigating officers that he wanted to cash in his chips and leave the Casino. Hamlin indicated that the Casino would probably not let Scheets continue to gamble because he was intoxicated, and Agent Brown informed Scheets that he would not be able to drive for the same reason. After arguing with Agent Brown about his level of intoxication, Scheets subsequently agreed to wait in Brown's car for Detective Rabe to arrive.

Upon Detective Rabe's arrival, Agent Brown and Scheets got out of Brown's car and met him. Due to inclement weather, the three returned to Agent Brown's car— Scheets and Brown in the front seats and Detective Rabe in the backseat. Agent Brown explained to Detective Rabe what he and Scheets had discussed in the security office. At that point, Scheets asked what his options were. Although Agent Brown and Scheets again disagreed about whether Scheets was too intoxicated to drive, Scheets ultimately accepted their offer to drive him to his motel located in Morton, Illinois, approximately thirteen miles from the Casino. Before departing for the motel, Scheets and Agent Brown returned to the Casino to retrieve Scheets's trench coat, which matched the coat worn by the robbery suspect in the photograph from the bank's surveillance video.

As the three men neared · the motel where Scheets was staying, Agent Brown and Detective Rabe stopped at a convenience store for coffee. Scheets declined their offer of coffee because, in his words, he intended to have a drink when they arrived at his room. Shortly thereafter, Agent Brown and Detective Rabe followed Scheets into his motel room and Scheets poured himself a glass of whiskey. Agent Brown immediately noticed a gray striped tie fitting the description of the one worn by the bank robbery suspect. After the three had been in the room for approximately twenty to thirty minutes, Agent Brown asked for Scheets's consent to search the room. In response to Scheets's statement that he would like to consult with his attorney prior to consenting to the search, Agent Brown informed him that he would be "freezing" the room to preserve

evidence until a federal search warrant could be obtained. Agent Brown then made arrangements to obtain the search warrant and explained to Scheets what was about to occur. Upon realizing the inevitability of the search of his room, Scheets consented to a search without a warrant. Scheets executed a written consent to the search and a waiver of his right to consult with an attorney prior to the search. Immediately thereafter, Scheets also completed an "Advice of Rights" form that set forth his *Miranda* rights and specifically stated that he waived those rights. Agent Brown then searched Scheets's trench coat and found the demand note Scheets used earlier that day during the robbery. At approximately 10 p.m., Agent Brown placed Scheets under arrest. Scheets then executed a written confession to the robbery.

Scheets was indicted for robbing First Financial Bank in violation of 18 U.S.C. § 2113(a). He filed a motion to suppress the physical evidence seized from the motel room and any written or oral statements made by him to the investigating officers on the day of the robbery. After conducting a hearing on this issue and listening to the testimony of Hamlin and Agents Carter and Brown and observing the videotape recording of the interview with Scheets in the Casino's security office, the district court concluded that the investigating officers had not deprived Scheets of his constitutional rights and denied Scheets's motion. The district court separated its analysis of the motion to suppress into two parts—the events occurring prior to and those occurring after the arrival at Scheets's motel room. With respect to the events occurring at the Casino, the district court found that Scheets was seized at the point Agent Carter informed Scheets that he would not be permitted to leave the Casino's security office. However, the district court concluded that his detention at that point and the additional questions posed by Agent Brown upon his arrival were consistent with a valid stop for investigative purposes under *Terry v. Ohio*, 392

U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court also found that even though Scheets was not arrested, at some point prior to the arrival at Scheets's motel room, probable cause to arrest him existed.

With respect to the events occurring after Scheets left the Casino with Agent Brown and Detective Rabe, the district court found that Scheets consented to traveling to his motel room and to the search of his motel room. Because the district court concluded that Scheets had not been placed in custody until the demand note was found, the court determined that there was no need for the officers to have informed him of his *Miranda* rights until that point.

After the denial of his motion to suppress, Scheets entered a plea of guilty to the one count of the indictment. This plea was conditioned on the reservation of the right to appeal the district court's denial of his motion to suppress.

## II. ANALYSIS

Scheets contends that the district court erred by denying his motion to suppress for two reasons. First, Scheets submits that the law enforcement officers violated his Fourth Amendment rights by seizing him without probable cause, and, therefore, any physical evidence obtained during this seizure, specifically the demand note, should have been suppressed. Second, Scheets asserts that the officers violated his Fifth Amendment rights by interrogating him during the time he was seized without probable cause and without reading him his *Miranda* rights. Therefore, Scheets contends that any incriminating statements he made during the alleged custodial interrogation, including his written confession, should also have been suppressed.

When reviewing a motion to suppress, questions of law are reviewed *de novo* and questions of fact are reviewed for clear error. *See United States v. Walden,*

146 F.3d 487, 490 (7th Cir.1998); *United States v. Liss*, 103 F.3d 617, 620 (7th Cir. 1997). A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Liss*, 103 F.3d at 620 (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994)). We review district court determinations of reasonable suspicion and probable cause *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Because questions arising under the Fourth and Fifth Amendments are primarily factual, "we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *United States v. McCarthur*, 6 F.3d 1270, 1275 (7th Cir.1993).

## A. Fourth Amendment Claims

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Not all encounters between the police and citizens implicate the Fourth Amendment's prohibition on unreasonable searches and seizures. *See United States v. Odum*, 72 F.3d 1279, 1283 (7th Cir.1995); *see also Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868; *McCarthur*, 6 F.3d at 1275. We have repeatedly recognized three categories of police-citizen encounters:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime.

> The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (citation omitted); *see also United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995) (quoting *Johnson*, 910 F.2d at 1506). We apply an objective standard to determine into which category an encounter between a citizen and police falls, *i.e.*, whether the encounter amounts to a "seizure" for purposes of the Fourth Amendment. *See United States v. Jerez*, 108 F.3d 684, 689 (7th Cir.1997).

■ In the present case, it is perhaps best to view the interaction between Scheets and the investigating officers along a continuum of time. The initial encounter between the investigating officers and Scheets at the Casino was clearly consensual. The degree of suspicion required to justify such an encounter is zero. *See United States v. Withers*, 972 F.2d 837, 841 (7th Cir.1992). In situations in which a person's freedom of movement is not restricted by a factor independent of police conduct, the encounter is considered consensual if "a reasonable person would feel free 'to disregard the police and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)); *Rodriguez*, 69 F.3d at 141. The determination of whether an encounter is consensual and, thus, falls within the third category of police-citizen encounters, is made on the basis of all relevant circumstances. *See Rodriguez*, 69 F.3d at 141. We have, however, identified several factors we consider in determining whether, based on the totality of the circumstances, a reasonable person would believe he was free to leave, including: whether the encounter occurred in a public or private place; whether the

suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance. *See McCarthur*, 6 F.3d at 1276; *Withers*, 972 F.2d at 842.

There is no dispute that Scheets agreed to accompany Agent Carter and Hamlin to the Casino's security office. And, there is no evidence that Scheets's consent to accompany them was coerced. While in the security office, Agent Carter continuously stressed to Scheets that he was not under arrest and that he was free to leave at any time. Moreover, the investigating officers neither made a showing of force nor utilized any other threatening behavior during their encounter with Scheets. And, although the security office was a non-public place within the Casino, the officers seated Scheets next to the door, offered to open the door for him, and seated themselves at opposite ends of the office.

 Agent Carter's explanation to Scheets of the circumstances prompting them to approach him and his request that Scheets remain in the security office did nothing to vitiate the consensual nature of this initial encounter. Law enforcement officers do not violate the Fourth Amendment by approaching an individual in a public place and asking the individual if he is willing to cooperate with an ongoing criminal investigation. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). And, that is exactly what happened during Scheets's initial encounter with Agent Carter and Hamlin in this case.

 Although the initial encounter between Scheets and Agent Carter and Hamlin was consensual, such a stop can develop into an investigatory stop depending upon the conduct of the investigating officers. *See Odum*, 72 F.3d at 1283. The encounter between Scheets and Agent Carter ripened into an investigatory stop at the moment that Agent Carter told Scheets he was not free to leave the security office. This investigatory stop continued upon the arrival of Agent Brown. Since the Supreme Court's decision in *Terry*, it has been established that a law enforcement officer may conduct a brief, nonintrusive detention of a person if the officer has specific and articulable facts sufficient to give rise to a reasonable suspicion that the person has committed or is committing a crime. *See Johnson*, 910 F.2d at 1508; *see also United States v. Boden*, 854 F.2d 983, 992 (7th Cir.1988) (providing that detentions under *Terry* are lawful if the law enforcement officer has a reasonable suspicion that the person "has been, is, or is about to be engaged in criminal activity"). In determining whether an investigatory stop was supported by reasonable suspicion, "we consider the 'totality of the circumstances' as they were presented to the officer at the time of the encounter." *McCarthur*, 6 F.3d at 1277 (citing *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). The Supreme Court has emphasized that "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We have also noted that the "totality of the circumstances" encompasses both "the experience of the law enforcement agent and the behavior and characteristics of the suspect." *Odum*, 72 F.3d at 1284.

 ▪ Our review of the totality of the circumstances in this case leads us to the conclusion that Agent Carter's initial decision to detain Scheets upon his attempt to leave the Casino's security office was supported by a reasonable suspicion that Scheets had robbed a bank earlier that

day. As Agent Carter testified before the district court, he compared Scheets to the photograph of the bank robbery suspect and noticed several similarities, which taken together would not likely have been ascribed to the population at large. These similarities included Scheets's use of a cane, his glasses, and the cupped appearance of one of his hands. When the additional information provided by the Peoria Police Department, which included a physical description of the suspect and confirmation that the suspect had a limp and used a cane, is considered in conjunction with Agent Carter's nineteen years of experience in law enforcement, there can be little doubt that reasonable suspicion existed to detain Scheets for investigatory purposes.

■ Moreover, we find nothing unreasonable about the length or scope of the initial detention. Less than fifteen minutes passed between the time Agent Carter informed Scheets that he could not leave the security office and the arrival of Agent Brown. Scheets was not questioned by anyone during this time. As the Supreme Court has recognized, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Agent Carter's maintenance of the status quo until the arrival of the law enforcement officer actually investigating the robbery was certainly the most reasonable and least intrusive action he could have taken with respect to Scheets. "Where the scope of the detention and the investigative technique employed is so 'carefully tailored to its underlying justification,' ... there is no Fourth Amendment violation." *McCarthur*, 6 F.3d at 1278 (quoting *Royer*, 460 U.S. at 500, 103 S.Ct. 1319).

■ The continuance of the *Terry* stop upon the arrival of Agent Brown was likewise justified by the same specific and articulable facts giving rise to the reasonable suspicion that Scheets committed the bank robbery. Agent Brown explained to Scheets that he was investigating a bank robbery and that Scheets bore some similarity to the suspect in the bank surveillance photograph. Agent Brown questioned Scheets about his identity and background and what he had done throughout the day. These and the other questions posed to Scheets were specifically tailored to establish Scheets's identity and either to confirm or dispel the officers' suspicions regarding Scheets's involvement in the bank robbery. Such questions are appropriate during a *Terry* investigatory stop. *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.").

■ The duration of Agent Brown's questioning of Scheets in the security office was also reasonable in light of the facts and circumstances of this case. We have recognized that "a court considering the reasonableness of a particular detention's duration must 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir.1994) (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Agent Brown questioned Scheets for approximately twenty minutes before he asked Scheets if he would be willing to wait outside for the arrival of Detective Rabe. Scheets's responses to the questions posed to him during the interview and the other evidence that existed at that time certainly justified additional investigation. Scheets matched the photograph and the physical description of the robbery suspect, was carrying approximately $800, and told

Agent Brown that he had been previously arrested for bank robbery. Furthermore, there is no indication that Agent Brown failed to pursue the investigation or his questioning of Scheets in a diligent manner.

■ Once Agent Brown completed his interview with Scheets in the security office, much more than reasonable suspicion to detain Scheets existed. At this point, the investigating officers had probable cause to arrest Scheets. "Probable cause [to arrest] exists when at the moment an arrest is made officers have 'facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information' that would sufficiently 'warrant a prudent man in believing that the [suspect] had committed or was committing the offense.'" *United States v. Muhammad*, 120 F.3d 688, 696 (7th Cir. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). We examined the application of the probable cause standard for arrest in *United States v. Tilmon*, 19 F.3d 1221, 1228–29 (7th Cir.1994). In *Tilmon*, we concluded that police officers had probable cause to arrest a bank robbery suspect once they were able to determine that the defendant matched the description of the suspect given on a police radio. *Id.* at 1228. This information was sufficient to justify an arrest when the arresting officers were able to consider it in conjunction with the defendant's distinctively marked car. *Id.*

In the present case, an even greater degree of certainty existed that Scheets had committed the bank robbery. The investigating officers were able to point to numerous distinctive characteristics shared by the suspect in the photograph developed from the bank's surveillance video and Scheets, including a comparison of physical appearance and characteristics, the use of a cane, and the ownership of a trench coat like the one used during the robbery. The officers' knowledge of the description of the suspect by witnesses of the bank robbery lent further support to the conclusion that Scheets committed the bank robbery, as did the approximately $800 in his pocket and his close proximity to the bank earlier in the day. Based on the totality of the information available to the investigating officers, a reasonable officer would conclude with certainty that probable cause existed to warrant the belief that Scheets committed the bank robbery. Because probable cause to arrest Scheets existed, his claim that the investigating officers detained him in violation of the Fourth Amendment fails.

Any claims that the agents improperly searched his motel room or improperly obtained a written confession from Scheets must also fail. Scheets submits that the consent he gave to the search of his motel room and personal effects and his written confession and any other incriminating statements are irreparably tainted solely because he believed that he was subject to a full custodial arrest without probable cause. Accordingly, he believes the fruits of the search—specifically, the demand note seized from his coat pocket—and his written confession are subject to suppression under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Scheets's Fourth Amendment rights were not violated by the search of his room without a warrant. "A warrantless search is permissible if police receive consent that is voluntarily given." *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992). There is no evidence that the investigating officers forced themselves into Scheets's motel room or coerced Scheets into consenting to the search of the room. We reach this conclusion despite recognizing that Scheets may have been somewhat intoxicated when he consented to the search of his room. The mere fact that an individual is intoxicated does not render consent involuntary. *See United States v. Gay*, 774 F.2d 368, 377 (10th Cir.1985). It is simply another factor to be taken in consideration when assessing the totality of the circumstances in

considering the voluntariness of consent. In the present case, there is no evidence in the record that Scheets was not aware of what he was doing or that he failed to appreciate the significance of his actions due to his consumption of alcohol.

Scheets voluntarily consented in writing to the search of his motel room after considering the fact that the room would inevitably be searched after Agent Brown obtained a search warrant. In executing the "Consent to Search" form, Scheets acknowledged that his consent was voluntary and that he was informed of his right to refuse consent. He also specifically waived his right to consultation with an attorney regarding the decision to consent to the search. His consent was not rendered involuntary by the fact that Agent Brown explained what would transpire to him. As we made clear in *White*, "[w]hen the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent." 979 F.2d at 542; *see also United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir.1994). In the present case, Agent Brown not only expressed a genuine intent to obtain a warrant to Scheets, he actually made the necessary arrangements and had to cancel these arrangements after Scheets consented to the search. Agent Brown's explanation that he was going to freeze the room until a search warrant could be procured also did nothing to impact Scheets's ability to consent to the search. Law enforcement officers may seize an area to avoid the destruction or removal of evidence when probable cause to search the area exists. *See Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) ("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."). Accordingly, we find that the officials did not violate the Fourth Amendment when they searched Scheets's room with his consent.

**B. Fifth Amendment Claim**

Likewise, we are unable to conclude that Scheets's Fifth Amendment rights were violated during his encounter with the investigating officers. The Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that a suspect must be advised of certain rights before he may be subjected to custodial interrogation to protect the suspect's right against self-incrimination. The so-called *Miranda* warnings must be given only if the suspect is "in custody" and subject to "interrogation." *See United States v. Saadeh*, 61 F.3d 510, 519 (7th Cir.1995). "If a suspect is taken into custody or otherwise deprived of freedom of action and is questioned without being informed of these rights, his responses may not be introduced into evidence to establish his guilt." *Id.*

Scheets contends that he was placed into custody at the moment he announced his intention to cash in his gambling chips and leave the Casino near the end of the interview in the security office because Hamlin told Scheets that the Casino would not let him gamble and Agent Brown told him that he would not let him drive because he was too intoxicated. At this point, Scheets claims that the official restraint on his freedom of movement was so intrusive and restrictive that it exceeded an investigatory stop under *Terry* and amounted to a full custodial arrest. This supposed custody allegedly continued from the time Agent Brown left the Casino with Scheets until Scheets was formally placed under arrest after the search of his room revealed the demand note.

Although Scheets asserts that he and Agent Brown and Detective Rabe continued to converse after the initial *Terry* stop outside the Casino and for approximately another half hour after returning to his motel room, the only statement Scheets specifically identifies as requiring exclusion is his written confession, which was executed only *after* he signed an "Advice

of Rights" form that provided him with all the prophylactic warnings required by *Miranda*. Again, Scheets based his argument that his written statement should have been excluded solely on his belief that he was detained without probable cause in violation of the Fourth Amendment.

■■■■ After an examination of the entire encounter between Scheets and the investigating officers, we are unable to conclude that the officers subjected Scheets to custodial interrogation in the absence of *Miranda* warnings. The investigating officers were not required to provide Scheets with *Miranda* warnings before conducting the *Terry* investigatory stop. *See United States v. Burns*, 37 F.3d 276, 281 (7th Cir.1994) ("[T]his court has held that *Miranda* warnings are not required where a suspect has been detained pursuant to a *Terry* investigatory stop."). Nor were the officers obligated to apprise Scheets of his *Miranda* rights before asking for his consent to search his car or his motel room. *See United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993) ("We have held that consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation.").

■■■■ Finally, and perhaps most importantly, we have serious doubts that Scheets was actually in custody prior to his formal arrest. "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is whether there [was] a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (citations and internal quotation marks omitted). This inquiry is based on "how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138. We acknowledge that even if a suspect is not formally arrested, an encounter with police may ripen into a de facto arrest if the encounter continues too long or becomes too intrusive. *See Robinson*, 30 F.3d at 784. However, the evidence presented before the district court during the suppression hearing demonstrates that Scheets was not in custody during his encounter with the police until he was formally arrested.

The encounter between Scheets and the investigating officers bears a significant similarity to the encounter which we found to be non-custodial between a suspect and police in *United States v. Jones*, 21 F.3d 165 (7th Cir.1994). In *Jones*, the defendant was involved in a narcotics transaction and a reverse sting operation in a motel room. After the transaction, which occurred at approximately 9:10 p.m., a uniformed police officer entered the room with a gun drawn and ordered one of the participants in the drug deal to empty his pockets. As the defendant exited the hotel room, one of the several police officers on the scene asked to speak with him. The defendant and two officers left the motel in a squad car. While in the squad car, the defendant consented to the officers' request to take him to police headquarters located about four miles from the motel. After their arrival at police headquarters, at least two officers questioned the defendant without *Miranda* warnings in a room with the door closed. During the course of the questioning, the defendant signed several forms consenting to the search of various properties he owned and made incriminating statements concerning his involvement in drug transactions. While there is no indication regarding the length of the questioning, we did note that the officers did not drive the defendant back to his office until after the search of his property that was conducted "in the early morning hours." *Id.* at 167. Even so, we concluded that the defendant was not in custody for purposes of *Miranda* for several reasons. First, the investigating officers did not handcuff the defendant or physically restrain him at any time during the encounter. Second, the officers re-

peatedly informed the defendant that he was not under arrest, was free to leave, and there was no evidence of threatening gestures or statements made to the defendant. Finally, we found that the defendant consented to being taken to the police headquarters despite the confrontational nature of the defendant's initial encounter with the officers. *Id.* at 170.

The present case closely parallels the encounter in *Jones*. Although Scheets's encounter with the investigating officers continued for just under three hours, the officers continuously told Scheets that he was not under arrest and was free to leave after the initial *Terry* investigatory stop with Agent Brown was completed. At no time did the officers handcuff Scheets or make any show of force or use of "strong arm tactics." There is also no evidence that the officers forced or coerced Scheets into cooperating with their investigation. Rather, the investigating officers continuously asked Scheets for his cooperation.

Although Scheets contends that the officers placed him in custody at the point Agent Brown told him that he would not be permitted to drive because he was too intoxicated, Scheets had approximately $800 in his pocket and he could have secured a cab or some other means of transportation for the thirteen mile ride back to his motel room in Morton or used the shuttle service provided by local hotels. Agent Brown testified before the district court that his refusal to let Scheets drive due to his intoxication was not a pretext for continued cooperation and no evidence in the record suggests a contrary conclusion. Rather than seeking other means of returning to his motel room or alternate accommodations, Scheets chose to continue the encounter with the investigating officers. In addition, the fact that Agent Brown asked Scheets if he would be willing to wait for the arrival of Detective Rabe in Brown's car and the officers' offer to take Scheets back to his motel room to continue any discussions fail to establish that he was in custody. While Agent Brown and Scheets were waiting for the arrival of Detective Rabe and during the ride from the Casino to Scheets's motel room, Scheets sat in the front seat of Agent Brown's car. Agent Brown testified before the district court that during his twelve years of experience as an FBI agent, no one in custody had ever been placed in the front seat of his car. Furthermore, although Agent Brown's car was a government issued vehicle, it was not the type of car typically driven by police officers. It was unmarked and did not have a screen separating the front and rear seats or any other features typically found in a police car. In other words, Scheets could exit the car freely of any action taken by Agent Brown if he so chose. In light of the foregoing, we conclude that the officers' actions in this case simply do not objectively amount to a show of authority sufficient to constitute an arrest. Even though Scheets claims to have submitted to the officers' actions, we have held that a suspect's submission to the investigating officers, standing alone, cannot elevate the encounter into a custodial arrest. *See McCarthur*, 6 F.3d at 1277.

Other facts also suggest that Scheets was not in custody. Scheets believed he was sufficiently free to refuse to consent to the search of both his car and initially to the search of his motel room. *See Withers*, 972 F.2d at 842 (noting that a defendant's belief that she was free to refuse consent to search of her bags as a factor in determining whether an encounter was consensual). Once Agent Brown, Detective Rabe, and Scheets arrived at Scheets's motel room, Scheets poured himself a glass of whiskey. It is doubtful that a person in custody would have considered himself free enough to pour and consume such a drink. Finally, Scheets had considerable experience on both sides of the law; he had two prior convictions for bank robbery and a post-graduate degree in the field of criminal justice and extensive employment experience in this field. Thus, we cannot say that he was in custody for

purposes of *Miranda*. In light of all the evidence presented to the district court, we conclude that the investigating officers did not violate Scheets's Fifth Amendment rights.

### III. CONCLUSION

The decision of the district court denying Scheets's motion to suppress evidence is AFFIRMED.