UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 28, 2006
Decided April 25, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-2609

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Central District of Illinois |
| *v.* | No. 04-30016-001 |
| RUSSELL O. STONEKING, *Defendant-Appellant*. | Jeanne E. Scott, *Judge*. |

### O R D E R

After the district court denied his motion to suppress evidence, Russell Stoneking pleaded guilty to one count of manufacturing methamphetamine, 21 U.S.C. § 841(a)(1), and one count of possessing a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1). On appeal he argues only that the district court erred in denying his suppression motion. We affirm.

### I. Background

The searches that produced the evidence Stoneking wanted to suppress arose from an incident at an apartment complex in Lincoln, Illinois. A police officer

detained Stoneking outside the complex while other officers searched an apartment for evidence of a methamphetamine laboratory. Officers eventually asked Stoneking for permission to search his person, which he gave. That search revealed that Stoneking was carrying ammunition, and he was arrested. A subsequent search of his vehicle discovered more ammunition, several firearms, methamphetamine, and paraphernalia associated with methamphetamine manufacturing. Following the search of his vehicle, Stoneking made incriminating statements to the police. He was charged with possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1); manufacturing methamphetamine, *id;* possession of a firearm as a felon, 18 U.S.C. § 922(g)(1); and possession of a firearm in furtherance of a drug trafficking offense, *id*. § 924(c)(1). He moved to suppress the physical evidence and statements, arguing that he was unlawfully detained outside the apartment and that the searches and his confession were thus tainted. The following facts are drawn from the testimony of several police officers and Stoneking himself at the suppression hearing. They are uncontested unless otherwise noted.

### A. *Officer Timothy Butterfield*

On January 20, 2004, a resident reported "an abnormal smell" coming from one of the apartments at 1018 Delavan Street, Lincoln, Illinois. Officer Timothy Butterfield responded and followed "a chemical odor" that "would burn your nose" to the second floor of the complex. Butterfield eventually tracked the odor to Apartment 4 and spoke to Daniel Julius, the tenant. When Julius opened the door, Butterfield testified, he could also see a "white male with long hair," whom he would identify as Stoneking, inside the apartment. Julius explained to the officer that the chemical odor was coming from his apartment because he had just poured "a bottle of Drano down his tub to free the clogged drain." Julius invited Butterfield inside, but the officer testified that he felt that the strength of the odor was inconsistent with Julius' explanation, and that because he suspected the smell was actually coming from a meth lab "for my personal safety I decided not to go in."

Officer Butterfield suspected, based on his past dealings with methamphetamine labs, that Julius was probably manufacturing the drug in his apartment. Butterfield left the complex and went to the local police station, where he met Inspector Jay Kitner of the Central Illinois Enforcement Group and explained the situation. Butterfield then returned to the apartment complex with Kitner and another inspector. They arrived at roughly the same time as Corporal Mark Coons, Butterfield's supervisor. Butterfield testified that he observed two people inside a car in the parking lot. He recognized the man in the passenger's seat as Julius, the resident of Apartment 4, and the driver as the "long-haired" man he had seen there. At the suppression hearing Butterfield confirmed that Stoneking was the man he had seen in the apartment and in the driver's seat of the

car.[1] Butterfield testified that Kitner approached Julius and engaged him in discussion "about a possible meth lab in the apartment." Julius invited the officers to search the apartment, and Butterfield accompanied Kitner, the other inspector, and Julius inside. Only Coons and Stoneking stayed behind. Butterfield did not say whether Stoneking was still in the car at this point, or whether Coons and Stoneking had encountered each other yet.

### B. Inspector James Kitner

Inspector Kitner's testimony closely tracked Officer Butterfield's account. He testified that when he arrived at the complex he recognized Julius from a file photograph. Although the two had never met, Kitner had "received information from various people that [Julius] was possibly involved in the manufacture of methamphetamine." But Kitner recalled the man sitting in the car with Julius as being a "short, bald, white male," rather than a man with long hair, as Butterfield had described him. Kitner testified that Julius agreed to show the officers the bathtub into which he said he had poured drain cleaner. But when the officers entered the apartment they perceived a harsh chemical haze inconsistent with commercial drain cleaners, and at that point asked for and received Julius' permission to search the rest of the apartment. Upon finding "several hundred" pseudoephedrine pills, drain cleaner bottles, and "a glass jar with methamphetamine actually stuck to the sides," the officers arrested Julius.

At some point during his time in the apartment, Inspector Kitner had learned that the "short, bald, white male" he had seen sitting in the car with Julius was named Stoneking. Kitner was familiar with that name, although he had never met the man. Kitner testified that another task force member, Tom Bonnett, had prior to that occasion told him about a man named Russell Stoneking, who was suspected of involvement with a house fire in Springfield, Illinois, that had been started by an out-of-control meth lab. Kitner also recalled that Bonnett wanted to speak with Stoneking about the fire.

Inspector Kitner went back downstairs to get supplies (such as evidence bags) to complete the search. He estimated that he had been upstairs for no more than fifteen or twenty minutes before he came down for the materials. When Kitner came down, he observed Corporal Coons and Stoneking standing "like they had been talking." Stoneking, who was not handcuffed and did not appear to Kitner to be detained, was smoking a cigarette. Kitner called Agent Bonnett from his

---

[1] Stoneking was bald at the time of the hearing, and other witnesses testified that he was bald at the time in question, but there is no dispute that it was Stoneking that Butterfield saw first inside the apartment and later in the car.

truck and asked if he was still interested in speaking with Stoneking. Bonnett replied that he already had discussed the fire with Stoneking, but after talking to him had received information about his involvement with other methamphetamine cooks and his possession of weapons. Bonnett also informed Kitner that Stoneking had said during interviews "that he would shoot it out if he was going to be arrested." After hanging up with Bonnett, Kitner asked Coons if he had searched Stoneking; when Coons said that he had not, Kitner asked Stoneking for permission to search him. Kitner testified that at this point in his mind he perceived Stoneking to be detained and not free to leave. Stoneking assented to the search and began to empty out his pants pockets. Among the objects he removed was a 9 millimeter cartridge. Because Bonnett had told Kitner that Stoneking was a felon, Kitner placed him under arrest for illicit possession of ammunition.

After Stoneking's arrest a canine unit arrived at the apartment. The dog "alerted" to Stoneking's car, indicating the presence of drugs. Inside the car police found a 9 millimeter pistol, a .22 caliber revolver, and a semi-automatic rifle modified to fire automatically. Stoneking's fingerprints were on each weapon. The search also uncovered more than 100 rounds of ammunition, paraphernalia associated with methamphetamine manufacturing, and the equivalent of 31 grams of methamphetamine. Inspector Kitner testified that after the search and Stoneking's arrest he proceeded to make incriminating statements, but Kitner did not give details.

### C. Corporal Mark Coons

Corporal Coons testified about his interactions with Stoneking while the two stood outside the apartment building, but he did not explain how the two came to be standing in front of the building to together. Coons never said that he saw Stoneking exit his car or enter the apartment complex, nor did he testify that he saw Stoneking leave the building. He merely described the interaction between Stoneking and himself after Stoneking appeared near the building. Coons maintained that he and Stoneking spent the time standing near the front porch of the building and talking. He was unable to recall the nature of the conversation. Coons testified that he never touched or attempted to physically detain Stoneking, and that Stoneking never attempted to leave or expressed an intention or desire to leave the scene. Contrary to Stoneking's later testimony, Coons did not recall telling Stoneking that he could not get his coat from the car or that he could not leave. But Coons conceded that, because he "didn't know what the officers had upstairs," he would not have allowed Stoneking to leave if he had asked or tried to depart. Coons contradicted himself later; he testified that he went with Inspector Kitner to Kitner's truck, leaving Stoneking alone, which he said he would not have done if he was trying to detain Stoneking.

*D.  Russell Stoneking*

When Stoneking testified he acknowledged that he was the man in Julius' apartment when Officer Butterfield first arrived to investigate the chemical odor. When the officers came back to search Julius' apartment, he explained, he was sitting in his car with Julius.  After Julius went upstairs with the officers, Stoneking realized that Julius had taken the remote control to Stoneking's car stereo with him.  Stoneking testified that he remained in the car for no more than a few minutes while the others went upstairs, and then walked upstairs —unescorted—to retrieve the remote control.  He explained that Corporal Coons was still in his car when the other officers and Julius went upstairs, that he and Coons exited their respective vehicles at the same time, and that when he went upstairs Coons was still approaching the building.  According to Stoneking, he entered the apartment, took the remote from a table inside the door, and made a statement out loud to the effect that he (Stoneking) had no business being there. Although Julius and all of the officers on the scene other than Coons were inside, no one spoke to him, and he left immediately.

As he walked back downstairs, Stoneking decided that he needed to leave the area because he "knew that there were drugs and guns" in his car, and he "wanted to get as far away from them as I possibly could."  He testified that "I was going to take off walking down the sidewalk," but that Corporal Coons stopped him. Stoneking was vague about how Coons caught his attention, saying that Coons "got my attention and he said something like hold on or wait a minute."  Stoneking said he "became agitated, demanding to know why I was not able to leave," but got only vague answers from Coons such as "just hold on, wait a minute, you can't leave yet." He indicated that he requested permission to leave more than five times, but was denied each time.  Adding to his agitation, according to Stoneking, was the fact that it was very cold outside, and he wanted his coat.  When he asked permission to get the coat from his car, Coons denied it.  Stoneking disputed Coons' assertion that he went to Inspector Kitner's truck and left Stoneking unescorted; according to Stoneking, Coons stayed with him while Kitner went to his truck alone.

Stoneking testified that he believed at the time that if he had attempted to leave the scene he "would have been physically restrained."  After what he described as a twenty- or thirty-minute wait, Inspector Kitner came downstairs. Stoneking agreed with Kitner's version of events, and stated that he not only gave Kitner permission to search his person but emptied his pockets, producing the 9 millimeter cartridge that prompted his arrest.  He added, however, that he did not feel that he had a choice about being searched.  Stoneking said that he felt that he "was in the process of being arrested," and that if he had refused the search, "the officer would have told me to turn around and put my hands on the tree and at that time they would have probably read me my Mirandas and pat me down [sic]."

### E. District Court's Ruling

The district court ruled from the bench and discussed its reasoning on the record. The court first invited argument from the parties. The prosecutor, when his turn came, expressed surprise that Stoneking had been inside the apartment during the search. He acknowledged that he did not know this until Stoneking revealed it through his testimony, and the government never argued that Stoneking's entry into the search scene justified his detention. Rather, the government focused entirely on whether Stoneking was detained, arguing that Coons' testimony established that he was not. The government also argued that, if Stoneking's testimony was true, he could not have been detained because Corporal Coons would not have allowed him to disappear upstairs unescorted (the prosecutor ignored Stoneking's testimony that he entered the building before Coons arrived at the door).

After hearing argument, the district court summarized the testimony and noted that the only real conflict was between Corporal Coons and Stoneking. The district court gave Stoneking "the benefit of the doubt" and accepted his version of events. From Stoneking's testimony, the district court guessed that Coons arrived at the front of the building to secure the scene just as Stoneking was going upstairs, and that when Stoneking came back down Coons "had a valid basis to detain" him "until he could talk to the other officers who were searching the apartment and inquire did this guy go into the apartment, did he take anything, did you tell him he could leave the apartment while you were searching it, are you sure he didn't grab the contraband and run, what's going on here." The district court did not address the fact that Coons never said he observed Stoneking either entering or leaving the building. Even so, Coons' information was sufficient, according to the court, to justify detaining Stoneking temporarily. Once Inspector Kitner learned that Stoneking had said that he would "shoot it out" with the police rather than be arrested—whether or not this was actually true—he was justified in searching Stoneking, the court decided. The bullet discovered in that search entitled Kitner to place Stoneking under arrest, and the arrest "lead later to the search of the car." Accordingly, the court ruled the evidence against Stoneking—the 9 millimeter cartridge, the guns and drugs found in his car, and his later statements—admissible at trial.

## II. Discussion

Stoneking argues only that Corporal Coons did not have "a reasonable suspicion, based on articulable facts, that [Stoneking] had committed a crime or was about to commit a crime." He essentially contends that since he would have departed if he had not been detained, all of the evidence obtained after his detention should be suppressed as the fruit of a poisonous tree. The district court

assumed that Stoneking was detained, but held that this was justified as an investigatory detention given Coons' knowledge that he had been inside the search perimeter.

The government now accepts the district court's assumption that Stoneking was detained as fact. It contends that the information available to Corporal Coons, including "Coons' discovery of the defendant's unauthorized access to the crime scene," made the detention lawful. Coons testified only about how he and Stoneking behaved while they were standing outside the building. Coons never testified that he saw Stoneking either enter or leave the apartment. Only Stoneking's testimony places him there; the government was surprised at the suppression hearing to learn that he had been inside the apartment during the time in question. Although Coons did not testify that he knew that Stoneking had entered or exited the apartment while the search was underway, Stoneking's own testimony suggests that he did: Stoneking did testify that Coons first called out to him as he was walking down the building's steps. Insofar as there was a conflict in the testimony, the district court resolved it in its analysis by assuming that Coons knew that Stoneking had been inside the apartment unescorted. But our review is *de novo*. *See United States v. French*, 291 F.3d 945, 950-51 (7th Cir. 2000). Even if we limit our consideration to Coons' own testimony and the knowledge of other officers with whom he was in contact, reasonably imputed to him under the collective knowledge doctrine, we conclude that Coons' knowledge was sufficient to make the detention of Stoneking lawful, and the district court correctly denied Stoneking's motion to suppress. *See United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("[T]he knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine.")

An investigatory detention is permissible when officers have a "reasonable suspicion that the target has committed, is committing, or is about to commit a crime." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968). There are other grounds for such temporary detentions. In a factually analogous case, *Illinois v. McArthur,* 531 U.S. 326, 328 (2001), the Supreme Court held that police were entitled to prevent a suspect from entering his own home until they obtained a search warrant. The Court analyzed the detention of the suspect in *McArthur* as an investigatory stop, although they did not explicitly call it one. The Court focused on reasonableness as the essential element of any intrusion on privacy interests that implicate the Fourth Amendment, and cited *Terry* among other cases addressing warrantless detentions based on "special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like." *Id.* at 330-31. The Court in *McArthur* analyzed four factors to determine whether the detention was lawful: (1) whether the police had cause to believe narcotics were present at the site to be searched; (2) whether there was a risk that

the suspect would impair the search; (3) whether the police made a reasonable effort "to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether the suspect was detained for an unreasonable amount of time. *Id.* at 331-33.

Applying this investigatory detention under the same framework as *McArthur*, we conclude that Corporal Coons' investigatory, thirty-minute detention of Stoneking was reasonable. First, Coons had probable cause to believe that the apartment being searched was being used to manufacture methamphetamine, and thus that Stoneking had committed a crime. Under the *Terry* analysis, reasonable suspicion is sufficient, as determined by the knowledge of the restraining officer at the time of the detention. *See United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002); *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996). (In *McArthur*, the police had probable cause to believe that there were narcotics present, but the Court did not hold that the higher standard was necessary. *McArthur*, 531 U.S. at 331-32.) Coons testified that "Officer Butterfield thought it might have been a meth lab," and that his role was to assist the other officers "in investigating that complaint." He understood that the other officers were upstairs actively searching Stoneking's associate's apartment for methamphetamine and manufacturing paraphernalia, and because he was aware of the ongoing search and the facts which led to it, he would have stopped and restrained Stoneking if he had tried to flee. Coons knew that Butterfield suspected a meth lab inside the apartment. Butterfield's suspicion was based on the report of another resident in the complex of an unusual smell in the building, which in Butterfield's past experience signified the presence of a meth lab. *See Jackson*, 300 F.3d at 746 (experience of officer included in totality of circumstances analysis); *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). The contemporary call complaining about the chemical reek also suggested that the lab was currently in operation, or had recently been in operation, at the time that Butterfield observed Stoneking inside the apartment. Under the totality of the circumstances, Coons had reason to suspect that Stoneking might have committed a crime. *Jackson*, 300 F.3d at 746.

Second, although Corporal Coons may not have reasonably believed that there was a risk that Stoneking had removed something from the search scene, the officer was justified in protecting the perimeter of the search in progress. In *McArthur*, the Supreme Court analyzed the reasonableness of the officers' suspicion that the suspect would destroy evidence if he was allowed to enter his home before they obtained a warrant. *McArthur*, 531 U.S. at 331. It is reasonable to see Stoneking's detention as a similar effort to protect the perimeter of the site being searched. Coons saw Julius sitting with Stoneking in Stoneking's car when the officers arrived, and observed the other officers talk with Julius before taking him upstairs to search the apartment. And Stoneking must have been out of Coons' sight at least temporarily according to Stoneking's own testimony. Coons also knew

that Stoneking had been seen in an apartment that the police suspected was an operating meth lab, and later recognized him sitting in a car with the occupant of that apartment. The Supreme Court has explicitly held that a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972). We have applied that holding to an investigatory detention of at least fifteen minutes. *See United States v. Scheets*, 188 F.3d 829, 838 (7th Cir. 1999). Stoneking was certainly the subject of suspicion; another officer had told Coons that there was a suspected meth lab operating upstairs, and that Stoneking had been seen inside it. We are of the opinion that Coons reasonably detained Stoneking in order to protect the status quo until his role in the meth lab being searched could be ascertained.

The detention also is reasonable under the third and fourth elements of the *McArthur* analysis, whether the officers made reasonable efforts "to reconcile their law enforcement needs with the demands of personal privacy" and limit the length of time of the detention. *McArthur*, 531 U.S. at 331-33. As in that case, the detaining officer here did not search the detainee, but merely temporarily detained him. Stoneking was not searched until he gave his permission, by which time Inspector Kitner had not only determined that the apartment Stoneking had been seen in was a meth production facility, but also had been told that Stoneking was habitually armed and had promised to violently resist arrest. While he was detained, Stoneking was not physically restrained. By his own testimony, Corporal Coons merely told him in vague terms that he shouldn't leave the premises. Nor was Stoneking detained any longer than necessary. In *Scheets*, 188 F.3d at 838, we held that up to a fifteen-minute detention was permissible and not overlong when it was intended to preserve the status quo until another officer arrived, and the suspect was not questioned. We cannot discern any substantial way in which this detention was more onerous than that in *Scheets*. Stoneking admitted that he was detained for no more than twenty or thirty minutes, and he was not questioned until Inspector Kitner asked for permission to search his person.

We are of the opinion that Corporal Coons had a probable cause, under the totality of the circumstances, to believe that Stoneking had committed a crime, or was about to commit a crime, by disrupting a search scene or participating in a meth cook, and he detained Stoneking for no longer than was necessary. Insofar as there was conflict in the testimony as to what Coons knew, it was the district court's job to resolve that conflict, and it did so. Accordingly, the district court's decision to deny the suppression motion is AFFIRMED.