**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 17, 2008
Decided January 5, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 08-1460

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Northern District of |
| | Illinois, Eastern Division. |
| *v.* | |
| | No. 1:06-cr-00660-1 |
| ASHLEY ASKEW-BELL, | |
| *Defendant-Appellant.* | Joan B. Gottschall, |
| | *Judge.* |

**O R D E R**

Ashley Askew-Bell was charged with robbing three banks. *See* 18 U.S.C. § 2113(a). She moved to suppress the evidence taken from her purse after an encounter with a police officer, as well as her post-arrest confession. The district court denied the motion, and Askew-Bell entered conditional guilty pleas to all three counts. She was sentenced to a total of 42 months' imprisonment. On appeal she challenges only the denial of her motion to suppress.

During the summer of 2006, a robber claiming to have a gun pulled off three bank heists near the Evanston-Chicago border. Two weeks after the third robbery, Askew-Bell, who had been visiting her aunt, walked out of an Evanston nursing home less than 100 yards from the Greater Bank of Chicago, one of the robbed banks. As she walked along Howard Street, which divides Chicago from Evanston, Officer Ralph Miezala spotted her from his vehicle. Miezala thought that Askew-Bell bore a strong resemblance to the photocopied surveillance pictures of the robber that he kept in his car: like the bandit, she was a "heavy-set or pregnant" black woman dressed in a white top, black pants, and dark sunglasses. She also carried her purse in a distinctive fashion, "high up underneath her arm," just like the robber. Miezala, who was driving the opposite way on Howard Street, turned his car around and followed Askew-Bell. She noticed him, though, and crossed the street to walk away from him. Miezala turned into an alley to avoid arousing Askew-Bell's suspicion, but eventually lost her.

Officer Miezala then drove to the Greater Bank of Chicago to make sure the robber had not attempted another heist. Finding the bank peaceful, he left and double-checked the photocopied surveillance pictures to confirm his sense that Askew-Bell resembled the bandit. As Miezala drove down Howard Street, he again spotted Askew-Bell walking near the nursing home. He radioed the dispatcher and asked for backup, and then parked his squad car and approached Askew-Bell. Miezala told her that she looked like someone the police were searching for and asked to see some identification. Askew-Bell replied that she did not have any identification. She also told Miezala that her name was "Bertha Sharp," though she twice misspelled her purported last name, omitting the "a" before she finally corrected herself on the third try.

Officer Miezala next asked for a date of birth and address. Askew-Bell provided an address and birth date (they later proved false) and then told Miezala she was eight months pregnant and needed to use a restroom. Miezala replied: "I'm not going to detain you long. I just want your name." She insisted that she needed to find a restroom immediately and asked Miezala if she could return to the nursing home to use its restroom. He relented, telling her that he would walk her back to the nursing home. He also explained to her that he was "looking for a female bank robber."

The pair entered the nursing home. As Askew-Bell approached the restroom, her purse began to slip off her shoulder. Officer Miezala, worried that she might have a gun in her purse or that she might try to escape through a window in the bathroom, grabbed the purse from her arm. She asked him to return it, explaining that she needed a tampon from the bag. He refused. She tried a different tactic, this time claiming she needed medication from the purse. He again refused and decided to prevent her from using the restroom and instead to radio for a female officer who could frisk her and search her purse. But as the

two walked back toward the nursing home's front door, Askew-Bell turned and fled back into the nursing home, escaping through an emergency exit.

A second officer, Brian Rust, had just arrived at the nursing home. He caught Askew-Bell in front of the facility and handcuffed her. Miezala, catching up with the others, emptied Askew-Bell's purse onto the "grass in front of her." Among the contents he discovered her student identification card, which bore her real name. He opened her wallet and saw part of a handwritten note with the words "I have a gun."

The officers took her to the police station, where a further search of her purse revealed a ten-dollar bill stained with red ink. Miezala also inspected the rest of the handwritten note, which reads in full: "I have a gun and will shoot! Put the money on the counter and let me leave and nobody gets hurt!" She eventually confessed to the officers that she was the robber of all three banks. The Evanston police then handed the case over to the FBI, and she was indicted for three counts of bank robbery.

She moved to suppress the contents of her purse and, as a "fruit" of the purse seizure, her post-arrest confession. At the hearing on the motion to suppress, Miezala testified that Askew-Bell was "a dead ringer" for the woman in the surveillance shots:

Q:        Did the person that you saw when you were driving eastbound resemble anyone that you had seen before?

Miezala:  Yes. I mean, when I was driving and then, you know, I saw her, I mean, that was—it was like I was looking at this photo—

Q:        Who did that person look like?

Miezala:  —of the robbery from the Chicago bank on July 22, the one that—

Q:        How close of a resemblance would you say it was?

Miezala:  Very close. I mean, you know, as far as color of the clothing, the sunglasses, the way she carried her purse, I mean, it was like a slap in the face. It was like wow. There was no hesitation.

Miezala also explained that he suspected Askew-Bell had given him a false name when she misspelled "Sharp." And he testified that he guessed her request for tampons was a ruse because women in their eighth month of pregnancy typically do not use tampons. Miezala conceded, however, that he frequently sees "heavy-set African-American women" near the

Evanston-Chicago border and that many women carry their purses "high under the arm" like Askew-Bell had. He also acknowledged that the photocopied surveillance pictures were somewhat blurry and less clear than the original photographs.

We first consider whether Askew-Bell's encounter with Officer Miezala was initially consensual or, as she contends, a Fourth Amendment seizure from the inception. The key question is whether a reasonable person would feel free to end the encounter. *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008). In making this determination, courts look to factors including the location of the encounter, the number of police officers present, and whether the officers escalated the encounter by displaying weapons, using a forceful tone or language, touching the citizen, or forcing the person to move to another location. *Clements*, 522 F.3d at 794; *United States v. Adamson*, 441 F.3d 513, 520 (7th Cir. 2006).

Askew-Bell suggests that no reasonable person would have felt free to leave after a police officer had just told her she resembled someone his department was searching for and then insisted upon accompanying her to the restroom. She may be right, but the point is irrelevant. No doubt this encounter was consensual at first but rapidly developed into a Fourth Amendment seizure, but the point at which the encounter evolved into a stop makes no difference because Officer Miezala had reasonable suspicion from the outset. The officer approached Askew-Bell because she resembled the woman in the bank surveillance photos, which provided a sound basis for initiating a *Terry* investigatory stop. *See United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008) (holding that defendant's resemblance to photograph of suspect gave police reasonable suspicion to conduct investigatory stop even though defendant turned out not to be the person in the photograph); *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) (holding that police reasonably suspected defendant was homicide suspect based on his resemblance to photograph of suspect); *United States v. Scheets*, 188 F.3d 829, 837-38 (7th Cir. 1999) (concluding detention of defendant was lawful because he resembled suspect depicted in bank's surveillance video); *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining that defendant's resemblance to suspect in surveillance video was most-significant factor giving police not only reasonable suspicion but probable cause for arrest).

Askew-Bell tries to distinguish our decision in *Scheets* by pointing out that the characteristics Officer Miezala relied on, including her clothing, pregnancy, and location near the bank, are far more common than the telling characteristics of the defendant in *Scheets*, which included a cane and the "cupped" appearance of one of his hands. *See Scheets*, 188 F.3d at 838. But she largely ignores the crucial fact of the surveillance photographs along with the requirement that we assess reasonable suspicion based on the totality of the evidence. *See United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). The district court did not clearly err in crediting Miezala's belief that Askew-Bell was "a dead

ringer" for the woman depicted in the surveillance photos, and that belief was therefore enough to create reasonable suspicion.

Askew-Bell next contends that, even if the stop was lawful, Officer Miezala "exceeded the permissible bounds of a *Terry*-stop" when he snatched her purse. A *Terry*-style seizure must be reasonable both at its inception and in its scope. *See United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Miezala offered two reasons for grabbing the purse: first, he was concerned that Askew-Bell would escape through a bathroom window; and, second, since the bank robber claimed to have a gun and threatened to shoot bank employees, he was worried that the purse might conceal a weapon that Askew-Bell could use to injure him or nursing-home residents. An officer may search a suspect for weapons on her person or within her control during a *Terry* stop so long as "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Cady v. Sheahan*, 467 F.3d 1057, 1061-62 (7th Cir. 2006) (quoting *Terry*, 392 U.S. at 27). And here, Miezala explained, he suspected that Askew-Bell was the robber and thus might be armed since the robber had threatened to shoot uncooperative bank employees. This concern was not unreasonable. *See Cady*, 467 F.3d at 1062 (upholding officer's seizure of man's briefcase where man was lurking in bushes outside of courthouse before it opened and was evasive in response to officer's questions); *United States v. Goodwin,* 449 F.3d 766, 768-69 (7th Cir. 2006) (holding that combination of fitting drug profile and giving suspicious answers justified officers' seizure of defendant's luggage); *see also United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004) (observing that "[c]ertainly a bank robbery is the type of violent criminal activity from which officers reasonably could infer that a suspect might be armed").

Askew-Bell next contends that Officer Miezala's decision to prevent her from using the bathroom and instead ordering her to return to the front of the building constituted a de facto arrest, requiring probable cause. We have frequently ruled that detentions significantly more intrusive than Askew-Bell's (at least at this point in her interactions with Miezala) do not necessarily rise to the level of a full-blown arrest. *See, e.g., United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (observing that police do not convert a *Terry* stop into a full custodial arrest simply by drawing weapons or handcuffing suspect); *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (holding that FBI executed a *Terry* stop, not an arrest, when agents blockaded defendant's car and approached with guns drawn). And a decision to move a suspect to a different location during a *Terry* stop does not by itself alter the nature of the encounter. *See, e.g., United States v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007) (noting that officers directed suspect to move from porch to sidewalk during valid *Terry* stop); *United States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002) (holding that transporting defendant to a different airport terminal did not convert stop into an arrest.) Indeed, we have observed that it was "pointless" for a defendant to contend that he was under arrest

when officers ordered him to move to another location, since it "just mean[t] that he was *seized*—an intrusion that is necessarily present in every *Terry* stop." *Shoals*, 478 F.3d at 853. Here, Miezala reasonably wanted to meet a female officer in front of the nursing home so that she could frisk Askew-Bell. He did not need probable cause to do so.

Askew-Bell's final argument is that Officer Miezala needed to obtain a warrant before he could search her purse and wallet. In the course of a lawful arrest "the police can [without need for a warrant] search not only the person they have arrested to make sure he doesn't have a weapon but also . . . can search the area within his immediate control" for a concealed weapon or evidence the suspect might otherwise destroy. *United States v. Tejada*, 524 F.3d 809, 811 (7th Cir. 2008) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). The fact that a particular object is no longer under the defendant's control at the time of the search is not enough to invalidate that search. *Tejada*, 524 F.3d at 812 (collecting cases); *see also United States v. Williams*, 483 F.3d 425, 430 (6th Cir. 2007) (holding that area within defendant's immediate control at any point during or just before his encounter with police was subject to search).

In *Tejada*, the defendant was apprehended "within a few steps" of an entertainment center, and we concluded that the police were justified in opening the cabinet in the entertainment center in part because the defendant could have lunged for a gun in the cabinet. *Tejada*, 524 F.3d at 811-12. In contrast, Askew-Bell was not in "grabbing distance" of the purse until Officer Miezala caught up with her and emptied the purse on the ground next to her. But even assuming Miezala's search of the purse exceeded his authority incident to her arrest, the officers would have been authorized to examine the purse and its contents once they reached the police station and inventoried her belongings. *See Tejada*, 524 F.3d at 813-14 (holding that doctrine of inevitable discovery allowed officers to open travel bag without warrant); *see also United States v. Jackson*, 189 F.3d 502, 508 (7th Cir. 1999) (discussing inventory-search exception to warrant requirement).

AFFIRMED.